308 Ga. 462
FINAL COPY

S20A0252.  ENSSLIN v. THE STATE.

NAHMIAS, Presiding Justice.

Appellant Gary Wayne Ensslin was convicted of malice murder and other crimes in connection with the shooting death of Stephen Wills. Appellant raises only one issue on appeal: he contends that in denying his motion for new trial, the trial court erred by ruling that the improper admission at his trial of statements that investigators elicited from him after he invoked his right to remain silent was harmless beyond a reasonable doubt. We disagree, so we affirm.[1]

---

[1] Wills was killed on December 13, 2007. On June 26, 2008, a Paulding County grand jury indicted Appellant for malice murder, three counts of felony murder, aggravated assault, burglary, two counts of theft by taking (one for each of two four-wheelers), possession of a firearm during the commission of a felony, and possession of a firearm by a convicted felon. Appellant was tried from October 6 to 10, 2008, and the jury found him guilty of all counts except possession of a firearm by a convicted felon, which was nolle prossed. The trial court sentenced Appellant to serve life in prison without the possibility of parole for malice murder, 20 consecutive years for burglary, five consecutive years for the remaining firearm count, and 10 consecutive years of probation for each theft count. The court purported to merge the felony murder counts into the malice murder count, but the felony murder counts were actually vacated by operation of law, see *Johnson v. State*, 292 Ga. 22, 24 (733 SE2d

The evidence presented at trial showed the following.[2] Appellant had known Wills since 1986. Over the next two decades, Appellant worked intermittently for Wills's tree cutting and landscaping business. Throughout most of 2007, Appellant lived in Wills's house in Paulding County. Wills owned a Ford F-350 pickup truck, two four-wheelers, and a utility trailer to transport the four-wheelers, all of which he kept at his house. Several members of his family testified that Wills usually did not loan his vehicles to family or friends, and that Appellant was allowed to drive the truck only for work, when Wills was around.[3] Wills was known to hide money in the master bedroom of his house and often carried large amounts

<hr />

736) (2012); the aggravated assault count merged. Appellant filed a timely motion for new trial on October 27, 2008, which he amended with new counsel more than a decade later on April 12, 2019. While the motion for new trial was pending, Appellant filed a motion to vacate a void sentence, which the trial court granted, ruling that Appellant's original sentence of life without parole for the murder was not authorized under OCGA § 17-10-7 (c); the court resentenced him to serve life with the possibility of parole. After a hearing held on April 14, 2019, the trial court denied Appellant's motion for new trial. He then filed a timely notice of appeal, and the case was docketed in this Court for the term beginning in December 2019 and orally argued on February 4, 2020.

[2] Because this case turns on an assessment of whether an error was harmless, we lay out the evidence in considerable detail and not only in the light most favorable to the jury's verdicts.

[3] Appellant testified that Wills occasionally would loan him the truck.

of cash in his wallet.

Just before Thanksgiving in 2007, Appellant began dating Deana Malone, whom he had falsely told that he was a professional wrestler with the stage name "Raging Bull." Around the end of November, Appellant told his friend Paul Carter that he owned two four-wheelers and planned to bring them to Carter's place in the next couple of days to drive them and then store them in Carter's garage. Appellant also asked Carter for a hunting rifle so that Appellant could go hunting with Wills. Carter told Appellant that he would try to get one. Over the next few days, Appellant asked Carter about the rifle "quite often" until Carter told Appellant, "Well, I don't know if I can get a hunting rifle." Appellant replied, "A pistol would be fine." Carter did not give Appellant a gun. In early December, Appellant, who knew that Malone owned a pistol, asked her son where she kept her pistol, but the son did not tell him.

According to Malone and her friend Kiley Lambert, on or around Monday, December 10, Appellant told them that he planned to bring two four-wheelers to Malone's house that weekend.

Appellant had previously shown Wills's two four-wheelers and truck to Malone and Lambert, claiming that he owned the vehicles.

That Thursday, December 13, around 4:00 p.m., Appellant called Malone and asked her to come to Wills's house to pick him up and to get her car, which he had brought there to repair. Malone and Lambert drove to Wills's house together. On the way, Malone told Appellant over two-way radio that she needed to use the bathroom when she got to Wills's house; Appellant told Malone that she would need to stop somewhere and use the bathroom because he had already locked up the house. When Malone and Lambert arrived, Appellant was waiting in the driveway; according to Lambert, he did not appear disheveled or distraught and showed no signs of a struggle, and Malone never went into the house. Wills's trailer was attached to his truck, his two four-wheelers were loaded onto the trailer, and all of Appellant's clothes were piled up inside the truck. Appellant briefly spoke to Malone before he got into the truck and Malone got into her car. Appellant, Malone, and Lambert then left in separate vehicles and drove to Malone's house.

When they got there, they all got into Malone's car and went to a Hardee's restaurant for dinner. Although typically Appellant did not pay for others' meals, he paid for the dinner. The three of them then picked up Malone's friend Terry Yancey and went back to Malone's house. There, Appellant and Yancey unloaded the four-wheelers from the trailer. Appellant also unloaded several tools and pieces of equipment from the back of the truck and put them in a shed behind the house. Yancey told Appellant that Yancey's brother-in-law repaired four-wheelers, and Appellant asked Yancey to take the two four-wheelers to his house to have his brother-in-law work on them, which Yancey did that weekend. Appellant also talked to Yancey about selling one of the four-wheelers. Appellant, Yancey, Malone, and Lambert then drove the four-wheelers around for a couple of hours.

The next morning (Friday), Appellant visited his ex-wife's brother in the hospital along with the ex-wife and some other family members. There, Appellant paid for the family's breakfast and lunch. Although typically Appellant did not carry a lot of cash on

him, his ex-wife saw him with two or three $100 bills.

That afternoon, Wills's father went to Wills's house to check on Wills because he had not heard from Wills since the prior morning. After knocking on several doors and windows with no response, he called 911. The responding officer noticed that the back door to the house had been damaged and was ajar. When the officer went inside, he saw that several items throughout the house had been broken or overturned, including a television in the living room and a china cabinet in the kitchen. In the living room, the officer found Wills's dead body lying face down in a pool of blood with a piece of a sectional sofa turned over onto his head. In Wills's bedroom, several drawers had been pulled out and rifled through. Wills's father told the officer that Wills's truck was missing.

Later that day, Paulding County Sheriff's Department Sergeant Kevin Morgan and GBI Special Agent John Farmer asked Appellant to come to the sheriff's office for an interview, and Appellant agreed to do so. When Appellant arrived at the office that evening, he was driving Wills's truck. The interview was video-

recorded, and the recording was later admitted into evidence and played for the jury at trial. During the interview, Appellant claimed that he left Wills's house the day before around 2:00 p.m. and had not communicated with Wills since that time. Appellant said that he spent the rest of Thursday with Malone and that Wills had loaned him the truck to use for the weekend. He also claimed that he had stopped by Wills's house earlier Friday morning to pick up a paycheck, but Wills did not answer the door. After more questioning and after the investigators told Appellant that they wanted to speak with Malone, Appellant stormed out of the room. The investigators followed him to get the keys to Wills's truck, which they impounded. According to Carter, at some point after the investigators impounded the truck, Appellant called Carter and said they had taken his truck and "[t]hey ain't going to take my four-wheelers, too."

Appellant left the sheriff's office on foot. According to Malone, he called her to pick him up, and she picked him up as he was walking down the road. Shortly thereafter, sheriff's officers stopped

her car and asked her to follow them to the sheriff's office, which she did. On the way there, Appellant told Malone to tell the investigators that he was at her house between 2:00 p.m. and 3:30 p.m. on Thursday and that he had gone by Wills's house on Friday morning to pick up a paycheck, neither of which was true. When Appellant and Malone arrived at the sheriff's office, Sergeant Morgan and Agent Farmer interviewed Malone while Appellant sat in the lobby; she initially gave the investigators the false alibi as Appellant had directed. According to Lambert, while Malone was in the interview room, Appellant called Lambert several times and asked her to call the sheriff's office and say that there was an emergency and Malone needed to come home, but Lambert was not able to reach Malone. After Malone's interview, Appellant agreed to be interviewed a second time. According to Sergeant Morgan, during that interview, Appellant told the investigators essentially the same story as he had in the first interview. Appellant and Malone then left the sheriff's office.

After Malone got home, she looked for her pistol so that she

could bring it to the investigators, but she could not find it. The next morning (Saturday), Malone asked Appellant and her son to help look for the pistol. Appellant claimed that he found the pistol inside a loveseat in the living room, although Malone had never put the pistol in the loveseat before. Appellant said to wipe off the pistol to remove the son's fingerprints.

According to Malone, on Monday afternoon, she asked Appellant if her pistol had been used to kill Wills, but Appellant would not answer. Malone then told Appellant that he needed to gather his belongings and get out of her house. Appellant packed up his things and left the house. Appellant then called Sergeant Morgan to say that he was leaving town because Malone had killed Wills and threatened to kill him if he left. Sergeant Morgan tried several times to set up a meeting with Appellant, but Appellant did not appear. Sergeant Morgan obtained an arrest warrant against Appellant for theft of Wills's four-wheelers. Appellant was then arrested and taken to the sheriff's office, where Sergeant Morgan and Agent Farmer interviewed him again; this interview was video-

recorded, and the whole recording was later admitted into evidence and played for the jury at trial.

At the outset of the interview, Appellant said that he did not want to speak to Agent Farmer, who then left the room. Sergeant Morgan advised Appellant of his rights under *Miranda v. Arizona*, 384 U. S. 436, 444-445 (86 SCt 1602, 16 LE2d 694) (1996), and Appellant agreed to be interviewed by Sergeant Morgan and signed a waiver-of-rights form. Appellant then claimed that Malone told him that she killed Wills because she did not like that Appellant and Wills were friends who spent so much time together. Appellant initially denied being present at Wills's house at the time Malone supposedly shot Wills, but he later said that he was there and saw her shoot Wills. Appellant claimed that after Malone shot Wills, she "thrashed" Wills's house, including destroying a television in the living room and turning over a china cabinet in the kitchen; that while Malone was still in the house, he attached the trailer to the pickup truck and loaded the four-wheelers onto the trailer; that Lambert waited outside during the entire incident; and that he took

the four-wheelers to Malone's house and drove them around later that night.

About 38 minutes into the interview, Appellant said, "I ain't got nothing else to say. . . . If you're going to charge me, you take me and charge me." Sergeant Morgan then asked Appellant several more questions about the murder and repeatedly told Appellant to tell the truth, but Appellant repeated that he had nothing else to say. Sergeant Morgan asked, "You don't want to talk to me anymore?" and Appellant replied "No." Sergeant Morgan nevertheless continued to question Appellant, who continued asking to be charged and booked. After some more of this back and forth, Sergeant Morgan left the room.

About a minute later, Sergeant Morgan returned to the interview room with Agent Farmer. Agent Farmer asked Appellant if Appellant wanted to speak to him; Appellant replied "I don't want to talk to nobody. Like I said, if you're going to charge me, charge me. And let's go." Agent Farmer then told Appellant that the investigators could prove that Malone did not go into Wills's house

on the day of the shooting and said, "[Y]ou really don't want to try to pass something off on – like this on someone that loves you." Appellant then asked Agent Farmer how Agent Farmer knew that Malone loved him, and Agent Farmer replied, "I mean, she said she'll always love you. . . . Don't cause us to go back over there and tell her that you're accusing her of killing the guy."

Appellant then admitted shooting Wills but claimed that he acted in self-defense. Appellant said that he and Wills had argued a couple of days before the shooting over money that Wills owed him, and he took Malone's pistol on the Tuesday before the murder for protection from Wills. Appellant said that on the day of the shooting, Wills "got up in my face" and that he had to shoot Wills to get Wills off of him; that he shot Wills twice in the head and once in the back; that he called Malone and told her to come to Wills's house to get her car; that while she was on the way, he loaded the four-wheelers onto the trailer and picked up the spent shell casings, which he threw away that evening; that he kicked the back door in; that the china cabinet fell while he was scuffling with Wills; that he looked

through Wills's bedroom for money; and that he stole $60 from Wills's wallet. At the end of the interview, Appellant wrote a statement to that effect, but he added that after he and Wills got into a "scuffle," he went upstairs to get a handgun before shooting Wills.[4]

After the interview, investigators found some of Wills's clothes in Appellant's car and numerous items that belonged to Wills, including tools and equipment, in the shed behind Malone's house. On Wills's answering machine, they found three voice messages that Appellant left on Thursday and Friday after the shooting; in the first

---

[4] The written statement, which was later read to the jury at trial, said: During and [sic] argument between me and Stephen Wills as he approached me and put his hands on me. As we were best friends for 22 yrs Steve would not quit putting his hands on me. As he turned me loose after we had already tore the house apart from our scuffle and argument I did in self defense shoot Mr. Wills with a handgun that I ran upstairs to get and came back down the stairs and shoot Mr. Wills. Are [sic] argument was over money and him being so disrespectful to me and other employees as he would take his bad days out on us after arguing with his girlfriend and wanted to whoop on individuals on a daily basis. Steve was never violent or rude to anyone until he met [his girlfriend] who would make Steve so mad that he wanted to hurt anyone who approached him in any way.

message left at 6:41 p.m. on Thursday, Appellant noted the time; in the third message left on Friday at 8:28 p.m., Appellant said that he was worried because he had not been able to get in touch with Wills since "two o'clock yesterday afternoon."

While in jail awaiting trial, Appellant sent Carter a letter to let him know "what happened." In the letter, Appellant said that he and Wills had been arguing for a few weeks over money and over Wills's derogatory comments about Malone, and that Wills had been threatening and abusing him for a few weeks before the shooting. Appellant also said: "Deana needs to know this so she can put two and two together and know what happened and know why I didn't tell her. What was really going on. . . . Please talk to her Paul. She needs to know what happened and I want to tell her myself." The letter did not suggest that Malone was involved in the shooting in any way. At trial, Malone was asked with regard to her interview at the sheriff's office, "you didn't worry you weren't going home because you didn't do anything?"; she replied, "That's exactly right." She also testified that she could not recall ever meeting or even seeing Wills.

The medical examiner who performed Wills's autopsy testified that Wills suffered three gunshot wounds: one shot into the back of his head that entered and exited the side of his skull and did not cause fatal injuries; another shot into the back of his head that fatally damaged his brain; and the third shot into his back. The medical examiner also said that a blunt impact wound on Wills's head may have been caused by the sectional sofa piece being thrown onto him. A firearms examiner testified that the two bullets recovered from Wills's body and a third bullet found outside Wills's bedroom were fired from Malone's pistol.

A detective who investigated the crime scene testified that Wills's bedroom had been ransacked: all of the drawers in the room were open and emptied; Wills's empty wallet was left on a desk; and a bag left on the counter of Wills's bathroom had been emptied. The detective also said that based on the pattern of destruction in the rest of the house, it was likely that the crime scene had been staged and that there had not been a struggle at the time that Wills was shot. Based on blood stain analysis, it appeared that after Wills was

shot, his head rested on the sectional sofa for more than a minute; that his body had then been pulled to the floor; and that the sectional sofa piece was then overturned onto his head.

Appellant testified at trial, telling a story generally consistent with the statements he made in the final part of his last interview, with some added details. He claimed that Wills had physically abused him in the past and that earlier during the week of the murder, he overheard a conversation in which Wills said that Appellant needed to be killed, which prompted him to get Malone's pistol to protect himself. Appellant said that on the day of the murder, he and Wills had been arguing and Wills said several times that Wills was going to kill him; that he went upstairs to get the pistol to protect himself; that when he came back downstairs, Wills was holding a baseball bat (although he did not know what happened to the baseball bat, and no baseball bat was found at the crime scene); that he shot Wills once in the back of the head and then again after Wills started to come toward him; and that Wills then fell to the floor and was still moving, so he shot Wills in the

back.

1. Appellant does not dispute the legal sufficiency of the evidence supporting his convictions. Nevertheless, as is this Court's practice in murder cases, we have reviewed the record and conclude that when viewed in the light most favorable to the verdicts, the evidence presented at trial and summarized above was easily sufficient to authorize a rational jury to find Appellant guilty beyond a reasonable doubt of the crimes of which he was convicted. See *Jackson v. Virginia*, 443 U. S. 307, 319 (99 SCt 2781, 61 LE2d 560) (1979). See also *Vega v. State*, 285 Ga. 32, 33 (673 SE2d 223) (2009) ("'It was for the jury to determine the credibility of the witnesses and to resolve any conflicts or inconsistencies in the evidence.'" (citation omitted)).

2. Appellant's sole contention on appeal is that the trial court erred by ruling that the improper admission at his trial of the statements that the investigators elicited after he invoked his right to remain silent during his last interview was harmless beyond a reasonable doubt.

(a) Before trial, Appellant moved to suppress his entire final interview. At a hearing on the motion, Appellant's counsel asked Sergeant Morgan, among other things, whether Appellant indicated during the interview that he wanted to stop talking; the sergeant denied that Appellant had done so. Counsel also asked if Agent Farmer questioned Appellant without re-advising him of his *Miranda* rights after he told Agent Farmer that he did not want to talk to the agent; Sergeant Morgan replied, "Yes, ma'am."

Appellant's counsel then argued that the waiver-of-rights form that Appellant signed was void and all of his resulting statements were involuntary because he was not informed that he potentially would be charged with murder. Counsel did not specifically argue that a portion of Appellant's statements should be excluded because they came after he invoked his right to silence. The recording of the interview had been admitted into evidence during the hearing; without watching it (or being asked to do so), the trial court ruled that the challenged statements were admissible. The court noted:

> The statement by Agent Farmer about — that

somebody loved him which then triggered some kind of conversation, I don't feel was in the nature of an interrogation that would in some way [make] me to want to limit or exclude the interview or the statement by the defendant.

The court then found that "[Appellant] was advised of his *Miranda* rights, that he understood them, that he voluntarily waived those rights, and thereafter gave a statement freely and voluntarily without any hope of benefit or fear of injury."

At trial, Appellant did not object to the admission of his final recorded interview or his written statement. During the charge conference, the trial court advised that it would leave to the jury the question of whether Appellant invoked his right to remain silent, saying, "As I reflected upon the actual statements there, I still am comfortable that it was proper to let it go to the jury because the law requires an unequivocal invocation of the right."

(b) In his motion for new trial (which was heard by a different judge over a decade after the trial), Appellant argued that the trial court erred by failing to exclude the statements that he made in his

final interview after he invoked his right to remain silent.[5] In its order denying the motion, the court ruled that the challenged statements should have been excluded, finding that Appellant unambiguously and unequivocally invoked his right to remain silent about 38 minutes into the interview when he said, "You know, that's it. I ain't got nothing else to say. . . . If you're going to charge me, you take me and charge me." Nonetheless, the court concluded that the erroneous admission of the statements was harmless beyond a reasonable doubt because of the "overwhelming" evidence against Appellant and because many of the statements were cumulative of Appellant's trial testimony. We see no error in the trial court's conclusion.[6]

---

[5] Appellant also claimed that his trial counsel provided ineffective assistance by failing to publish the recording of his final interview during the pretrial hearing; by failing to argue during the hearing that Appellant invoked his right to remain silent during the interview; and by failing to object at trial to the admission of the interview recording and his written statement. The trial court rejected those claims, and Appellant does not raise them on appeal. As discussed below, however, his trial counsel's testimony about those claims at the motion for new trial hearing is pertinent to the harmless-error claim that Appellant does raise here.

[6] Given our holding that the erroneous admission of the disputed statements was harmless, we need not decide whether Appellant waived his

(c) "The law is clear that, when a person in the custody of law enforcement officers unambiguously and unequivocally invokes his right to remain silent in connection with their interrogation, the interrogation must cease immediately." *Davidson v. State*, 304 Ga. 460, 468-469 (819 SE2d 452) (2018). If the interrogation continues after the defendant has invoked his right to remain silent, the admission at trial of his subsequent statements is constitutional error. See id. at 470. In deciding Appellant's motion for new trial, the trial court correctly ruled — as counsel for the State belatedly conceded at oral argument — that Appellant unequivocally invoked his right to remain silent about 38 minutes into his final interview when he said, "You know, that's it. I ain't got nothing else to say. . . . If you're going to charge me, you take me and charge me." See, e.g., id. at 469 (holding that the defendant unequivocally invoked his

---

claim that his right to remain silent was violated by not specifically objecting to the admission of those statements on that ground before or at trial. In this regard, we note that the former Evidence Code applied to Appellant's trial in 2008. Under the current Evidence Code, even if Appellant failed to properly object to the trial court's evidentiary ruling, the ruling could be reviewed on appeal for plain error under OCGA § 24-1-103 (d). See *Kemp v. State*, 303 Ga. 385, 397-398 (810 SE2d 515) (2018).

right to silence when he repeatedly said that he had "nothing to say"); *Mack v. State*, 296 Ga. 239, 243 (765 SE2d 896) (2014) (holding that the defendant unequivocally invoked his right to remain silent when he said, "I'm done. I have no more to say. I'm done. Let's ride."); *State v. Moon*, 285 Ga. 55, 57 (673 SE2d 255) (2009) (holding that the defendant unequivocally invoked his right to remain silent when he said, "I ain't got no more to say. I mean, that is it."); *State v. Nash*, 279 Ga. 646, 648 (619 SE2d 684) (2005) (holding that the defendant unequivocally invoked his right to remain silent when he said that he wanted "to just sit back and . . . get his charges" and then "clearly shook his head in the negative" when an interrogating officer asked, "you don't want to talk about it?").

Appellant then continued to invoke his right to silence numerous times by repeating that he had nothing else to say, by telling Sergeant Morgan, "No," when asked "You don't want to talk to me anymore?," and by telling Agent Farmer "I don't want to talk to nobody. Like I said, if you're going to charge me, charge me. And let's go." The investigators blatantly violated Appellant's

constitutional right to remain silent by continuing to interrogate him about Wills's shooting until he made the statements now at issue. See *Davidson*, 304 Ga. at 467 ("From our review of the record, it seems clear that [the defendant] invoked his constitutional right to remain silent . . . often in the interview, but the investigators repeatedly disregarded those invocations and pressed forward with their efforts to elicit a statement from [the defendant].").

(d) Even an error of constitutional magnitude, however, may be deemed harmless "'if the State can prove beyond a reasonable doubt that the error did not contribute to the verdict, such as when the evidence at issue is cumulative of other properly-admitted evidence or when the evidence against the defendant is overwhelming.'" *Davidson*, 304 Ga. at 470 (citation omitted). See also *Frazier v. State*, 278 Ga. 297, 298 (602 SE2d 588) (2004). When deciding whether a trial court's error was harmless, "we review the record de novo, and we weigh the evidence as we would expect reasonable jurors to have done so as opposed to viewing it all in the light most favorable to the jury's verdict." *Peoples v. State*, 295 Ga.

44, 55 (757 SE2d 646) (2014) (citation and punctuation omitted).

As an initial matter, although Appellant argues that we should not consider his own testimony in the harmless error analysis because he was compelled to testify by the court's error at trial in admitting the challenged statements, he "has not shown that the ruling admitting his statement[s] was the primary factor in his decision" to testify. *Linares v. State*, 266 Ga. 812, 814 (471 SE2d 208) (1996). To the contrary, the record shows that Appellant likely would have testified even if the challenged statements had been suppressed. During the motion for new trial hearing, Appellant's trial counsel testified that counsel determined that pursuing a self-defense theory was the best strategic option available — "the least worst of [Appellant's potential] defenses" — because relying on Appellant's initial claim that he knew nothing about Wills's shooting, or his next claim that Malone had shot Wills, was not viable given the other evidence; that counsel "certainly wanted [Appellant] to testify" in support of the self-defense theory; that Appellant never indicated that he was interested in (nor did he even

ask about) any defense other than self-defense; and that after counsel explained to Appellant that testifying was "strictly his option," Appellant did not express "any kind of strong opinion about not wanting to testify."

Moreover, immediately before Appellant testified, the trial court explained to him that whether to testify was ultimately his own decision; the court then asked, "What is your decision about testifying or not testifying?" to which Appellant replied, "Testify." Finally, Appellant did not testify or present any other evidence at the motion for new trial hearing to show that he would not have testified at trial had the challenged statements been suppressed. Because the record establishes that Appellant likely would have testified even if the challenged statements had been suppressed, his claim that he was compelled to testify by the trial court's error is unsupported and speculative, and we may properly consider his testimony in the harmless error analysis. See *Linares*, 266 Ga. at

814-815.[7]

Doing so, it is clear that the challenged statements were cumulative of Appellant's testimony admitting that he killed Wills but claiming self-defense, rendering their admission harmless beyond a reasonable doubt. See, e.g., *Bearden v. State*, 241 Ga. App. 842, 844 (528 SE2d 275) (2000) (holding that even if the defendant's custodial statements were involuntary, their admission was harmless beyond a reasonable doubt because they were cumulative

---

[7] Appellant argues that this Court's decision in *Starks v. State*, 266 Ga. 547 (468 SE2d 376) (1996), precludes us from considering his testimony in the harmless-error analysis. We disagree. In *Starks*, a probation officer continued to interrogate the defendant after he invoked his Sixth Amendment right to counsel; the trial court erroneously admitted the defendant's subsequent statements; and the defendant then testified consistently with those statements. See id. at 548-549. We held that even though the challenged statements were cumulative of the defendant's testimony, their admission was not harmless beyond a reasonable doubt because the defendant's decision to testify "was likely based on the need to explain inconsistencies between the highly inculpatory testimony from the probation officer, and the two previous statements elicited from him during the police investigation"; accordingly, had the disputed statements been suppressed, he may well have chosen not to testify. See id. at 549. Here, unlike in *Starks*, the record shows that Appellant likely would have testified even if the challenged statements were suppressed, in part because the disputed statements supported a more viable defense than his prior, unchallenged statements. We also note that we have never cited *Starks* for the proposition that courts are precluded from considering a defendant's trial testimony in harmless-error analysis, and indeed courts have considered such testimony, as the cases cited after this footnote illustrate.

of his and his co-defendant's trial testimony); *Pierce v. State*, 209 Ga. App. 366, 367 (433 SE2d 641) (1993) (holding that even if the defendant had invoked her right to remain silent, the admission of her subsequent statements was harmless beyond a reasonable doubt because they were cumulative of her trial testimony). See also *McCord v. State*, 305 Ga. 318, 324 (825 SE2d 122) (2019) (holding that even if the admission of a non-testifying witness's statement through the testimony of a police officer violated the Confrontation Clause, it was harmless beyond a reasonable doubt because it was cumulative of other admissible statements that the witness made to a different police officer); *Frazier*, 278 Ga. at 298 (holding that even if the questioning officers had failed to honor the defendant's right to remain silent, the admission of his subsequent statements was harmless beyond a reasonable doubt because they were cumulative of what he had previously told two other people).

Even if we did not consider Appellant's testimony, the other evidence against him was overwhelming. There was evidence that Appellant made preparations for the shooting and theft in the weeks

before the murder by trying to get a gun and by telling Carter, Malone, and Lambert that he would soon bring over two four-wheelers (after having falsely told each of them that he owned Wills's four-wheelers). On the day of the shooting, Appellant would not allow Malone to go into Wills's house to use the bathroom; he stole Wills's truck, trailer, and four-wheelers, along with the clothes later found in Appellant's car and the tools and equipment later found in Malone's shed; and he started paying for others' meals and was seen carrying large sums of cash (neither of which he usually did) after Wills's bedroom (where Wills was known to hide cash) had been ransacked and Wills's wallet (in which Wills carried large sums of cash) had been emptied. Appellant also claimed to have found the pistol used to kill Wills in Malone's loveseat, even though she had never placed the pistol there before. Moreover, Appellant claimed in his first two interviews that he knew nothing about how Wills died; he asked Malone to provide a false alibi for him and asked Lambert to interrupt Malone's interview with a fake emergency; and he left messages on Wills's answering machine pretending that he did not

know Wills was dead despite his later admissions that he knew Wills had been killed by that point.

Appellant claimed next that Malone had killed Wills and that she threatened to kill him too, but he repeatedly avoided meeting with Sergeant Morgan to discuss the supposed threat; Lambert testified that Malone never went into Wills's house; Malone testified that she had never even seen Wills; and Appellant's jailhouse letter to Carter indicated that Malone did not kill Wills and indeed that Appellant wanted to let her know "what happened." In the properly admitted portion of Appellant's final interview before he invoked his right to silence, in which he explained how Malone supposedly killed Wills, he contradicted himself multiple times as to significant incriminating facts. And this claim is inconsistent with Appellant's possession of the many items stolen from Wills and his eventual story of self-defense.

As for Appellant's final claim of self-defense, while it may have been stronger than his previous stories, it was, as his trial counsel accurately characterized it, just his "least worst" defense. Lambert

testified that Appellant did not appear disheveled or distraught when she and Malone arrived at Wills's house shortly after the murder; the bullets recovered from Wills's body matched Malone's pistol and Appellant lied about finding her pistol in the loveseat later; the crime scene did not show evidence of a struggle but rather appeared staged; Wills's injuries were not consistent with self-defense; Appellant stole Wills's cash, clothes, tools and equipment, and vehicles after the shooting; there was no other evidence that Wills had a baseball bat; and even if a juror *did* believe that Wills threatened Appellant, Appellant said that he then went upstairs and got the gun before coming back downstairs and shooting Wills in the back of the head and again after Wills fell to the floor. See *Rammage v. State*, 307 Ga. 763, 766 (838 SE2d 249) (2020) ("There simply was no evidence to support a *reasonable* belief that Appellant needed to use deadly force to defend himself . . . against the *imminent* threat of use of unlawful force by [the victim]." (emphasis in original)); *Cloud v. State*, 290 Ga. 193, 196 (719 SE2d 477) (2011) ("Justification cannot be based on an assault which has ended[.]").

For these reasons, the trial court's error in admitting the challenged statements at trial was harmless beyond a reasonable doubt. See, e.g., *McCord*, 305 Ga. at 324; *Bearden*, 241 Ga. App. at 844.

*Judgment affirmed. Melton, C. J., and Blackwell, Boggs, Peterson, Warren, Bethel, and Ellington, JJ., concur.*

DECIDED APRIL 6, 2020.
Murder. Paulding Superior Court. Before Judge Bucci.
*Keegan C. Gary, Hunter J. Rodgers*, for appellant.
*Donald R. Donovan, District Attorney, Anthony B. Williams, Assistant District Attorney; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Meghan H. Hill, Assistant Attorney General*, for appellee.