310 Ga. 685
FINAL COPY

S20A1289.  JOHNSON v. THE STATE.

WARREN, Justice.

Sharod Johnson was convicted of malice murder and other crimes in connection with a string of armed robberies that culminated in the shooting death of David Lee Casto.[1]  On appeal,

---

[1] The crimes occurred on August 25 to 26 and September 5, 2010.  On March 15, 2011, a Forsyth County grand jury issued a multiple-count indictment against Johnson and four of his accomplices.  The indictment charged Johnson with armed robbery of Alicia Richard, aggravated assault of Kenneth Barrett, armed robbery of Suzette McCrary, burglary of an Ingles store, armed robbery of Casto, armed robbery of Rosa Marie Turpin, aggravated assault of Turpin, malice murder of Casto, felony murder of Casto predicated on armed robbery of Turpin, and felony murder of Casto predicated on burglary.  Johnson was tried separately in August 2013, and the jury found him guilty of all counts.  The trial court sentenced Johnson to life in prison for malice murder, a consecutive term of life imprisonment for the armed robbery of Casto, a consecutive term of 20 years for the aggravated assault of Turpin, two concurrent terms of 20 years each for the armed robberies of Richard and McCrary, and a concurrent term of 20 years for the aggravated assault of Barrett.  The remaining counts were merged or vacated by operation of law.  Although the trial court erred in merging the burglary count with one of the felony murder counts, see *Carter v. State*, 299 Ga. 1, 2-3 (785 SE2d 532) (2016), this merger error benefits Johnson, and the State has not raised it by cross-appeal, so we decline to correct the error.  See *Dixon v. State*, 302 Ga. 691, 698 (808 SE2d 696) (2017).  Johnson filed a timely motion for new trial on August 22, 2013, and he amended it through new counsel on November 28, 2018.  After a hearing, the trial court denied the motion, as amended, on June 24, 2019.  Johnson timely appealed, and this case was docketed in this Court to the August 2020 term and submitted for a decision on the briefs.

Johnson contends that the trial court erred when it failed to strike the testimony of a State witness and that Johnson was deprived of the effective assistance of counsel with regard to that witness. Johnson also contends that the trial court erred when it denied his motions to suppress evidence related to searches of his cell phone, home, and car. Seeing no reversible error, we affirm.

1. Viewed in the light most favorable to the verdicts, the evidence presented at trial showed that Johnson and his co-indictees — Tyrice Adside, Travarius Jackson, Nakitta Holmes, and Darren Slayton — were friends or acquaintances and spent time together in the summer of 2010. In late August and early September 2010, Johnson and the others engaged in three separate armed robberies, as detailed below.

*The Waffle House Robbery.*

In August 2010, Johnson, Adside, and Slayton decided to rob a Waffle House in Forsyth County. To carry out the robbery, the men used Johnson's shotgun (which he kept in the trunk of his car) and a .40 caliber Glock handgun that they borrowed from another

2

acquaintance, Ardansac McMillan. Around 1:00 a.m. on August 25, the trio drove to the Waffle House in Johnson's car and parked at the back of the building. Johnson and Adside then got out, jumped over a fence, and ran inside the Waffle House dressed in all-black clothing and with their faces covered with t-shirts. Adside carried the shotgun and Johnson carried the handgun, though both weapons were unloaded at the time. Inside the restaurant, the men encountered a server, Alicia Richard, and the cook, Kenneth Barrett. Adside threatened Richard with the shotgun and had her give him money from the cash register. Meanwhile, Johnson pointed a gun at Barrett and demanded that he open the safe. When Barrett said he was unable to do so, Johnson threatened to kill him. Adside and Johnson then took the money from the cash register and left.

*The Chevron Robbery.*

After robbing the Waffle House, Johnson and his accomplices decided to rob a Chevron gas station on Buford Highway, where Adside had been a customer and "knew the lady inside." This time, five men participated in the robbery: Johnson, Adside, Jackson,

3

Holmes, and Slayton.  Early in the morning of August 26, the group drove to the gas station in Johnson's car and parked behind the building.  Adside stayed in the car while Johnson and the others went inside the gas station, where Suzette McCrary was working the night shift as a cashier.  Holmes carried Johnson's shotgun, and Jackson carried McMillan's handgun.  The four men confronted McCrary, forced her at gunpoint to give them cash from the registers, and stole some cigarettes.  After the robbery, on the way home, Slayton and Jackson referred to Holmes as a "beast" because he was "good at what he does," and Johnson and the others laughed.

*The Ingles Robbery.*

After the Chevron robbery, Johnson suggested to Adside and the others that they rob the Ingles grocery store where Johnson worked as a cashier; Johnson said the robbery would net "a lot of money" — over $20,000 — and would be easy to accomplish. Johnson informed the group that a security guard would be present, so the men devised a plan to "tie him up and put him in the freezer," and Holmes said that "if the guard tried to buck or anything, he was

4

going to shoot him." The night before the robbery, Johnson, along with Adside and Jackson, drove by Ingles to "case the place." Afterward, the trio drove to a nearby Waffle House, where they ordered a drink.

On the evening of September 5, after Johnson began his shift at Ingles, Adside, Jackson, and Holmes drove to Ingles in Johnson's car, parked in the back of the store near the loading dock, and texted Johnson to alert him of their arrival. Johnson opened the back door, let the others inside, and told them to wait inside the meat freezer, though he moved the men to the milk cooler when Adside complained that the freezer was too cold. As they had planned, Holmes carried the shotgun, and Jackson carried the handgun.

Around 11:00 p.m., only three employees remained at the store: Johnson, Casto (the security guard), and Rosa Marie Turpin (the assistant manager). When all three employees went to the back of the store to check the security door, Adside and his group came out of the cooler with their faces covered, pointed their guns at the employees, and told them to get down. The men then placed tape on

5

Casto's eyes and wrists and removed his gun and bulletproof vest. When Holmes took the guard's gun, Adside took the shotgun Holmes had been carrying. Adside then placed Casto in the freezer and closed the door, while Holmes and Jackson went to the front of the store and forced Turpin at gunpoint to give them cash from the safe and the self-check-out counters. As the money was being retrieved, Holmes went to the back of the store and shot Casto, who was still tied up in the freezer.

After collecting the money and some cigarettes, Adside and his group took Johnson and Turpin to the back of the store and placed tape on Turpin's eyes and wrists, while Johnson did the same to himself. The trio then moved Turpin and Johnson into the freezer where Casto was lying, though Turpin did not know at the time that Casto had been shot or that he was in the freezer with them. Adside, Holmes, and Jackson left the store and drove to McMillan's house in Buford, where they split the proceeds of the robbery. Meanwhile, Johnson was able to free himself relatively quickly, and Turpin — not realizing at the time that he was involved in the robbery —

asked him to call the police. Johnson did not want to use his own phone, however, and suggested that Turpin use hers. When the police arrived on the scene, they found Casto lying in the back of the freezer and determined that he was deceased. An autopsy revealed that Casto died from a close-range gunshot wound to the head.[2]

Johnson does not challenge the sufficiency of the evidence. Nevertheless, consistent with this Court's general practice in murder cases, we have reviewed the record and conclude that, when viewed in the light most favorable to the verdicts, the evidence presented at trial was sufficient to authorize a rational jury to find beyond a reasonable doubt that Johnson was guilty of the crimes for

---

[2] Much of the evidence against Johnson came from the testimony of Adside, who participated in all three robberies, and the testimony of the robbery victims: Richard, Barrett, McCrary, and Turpin. The State also presented the testimony of Johnson's friend, Adaria Cooper, who testified that she had seen a shotgun in the trunk of Johnson's car, that she was present when Adside, Holmes, and Jackson arrived at McMillan's house after the Ingles robbery, and that the men discussed the robbery and flaunted the proceeds.

which he was convicted. See *Jackson v. Virginia,* 443 U.S. 307, 318-319 (99 SCt 2781, 61 LE2d 560) (1979).[3]

2. Johnson contends that the trial court erred when it failed to strike the testimony of Darren Slayton after he invoked the Fifth Amendment privilege against self-incrimination and refused to testify further at trial. Slayton had pleaded guilty to two charges of armed robbery for his involvement in the Waffle House and Chevron robberies, and he was called by the State as a witness at Johnson's trial. The prosecutor began the direct examination by eliciting background information from Slayton. Among other things, Slayton testified that he had introduced Adside to Johnson, that Slayton had talked to Johnson "at community service," and that he, Johnson, Jackson, and McMillan regularly spent time at McMillan's home, where they smoked marijuana and consumed "X pills." Slayton also testified that he had seen a shotgun in the trunk of Johnson's car.

---

[3] We remind litigants that, starting with cases docketed to the term of this Court that began in December 2020, we will end our practice of considering sufficiency sua sponte in non-death penalty cases. See *Davenport v. State,* 309 Ga. 385, 398-399 (846 SE2d 83) (2020). This Court began assigning cases to the December term on August 3, 2020.

8

The prosecutor then started questioning Slayton about the events of August 25, 2010; Slayton testified that, on that day, Johnson called him and asked what he was doing, after which they went to meet with McMillan and Jackson. Before providing any more details, however, Slayton said, "I'm sorry, I can't do this. I'm sorry, I can't do this. I can't — I plead the Fifth. I can't talk anymore. I'm sorry." After confirming that Slayton had invoked his Fifth Amendment privilege against self-incrimination, Johnson's lawyer moved to strike Slayton's "entire testimony." The State opposed the motion, stating that Johnson could "cross-examine [Slayton] on the stuff that he's testified about," but that Johnson "just apparently can't go any further, unless [Slayton] chooses to testify further." The trial court told Johnson's lawyer: "I will permit you to cross-examine [Slayton] on what he's testified about. But he's indicated he's not going to go further." Johnson's lawyer responded, "Then I don't believe I have any questions." At that point, Slayton left the stand, and the State called its next witness.

On appeal, Johnson argues that the trial court's failure to strike Slayton's testimony violated his right to confrontation. We disagree.[4] "The main and essential purpose of the right of confrontation is to secure for the opponent the opportunity of cross-examination." *State v. Vogleson*, 275 Ga. 637, 638 (571 SE2d 752) (2002) (quoting *Davis v. Alaska*, 415 U.S. 308, 315 (94 SCt 1105, 39 LE2d 347) (1974)) (punctuation omitted). See also OCGA § 24-6-611 (b) (". . .The right of a thorough and sifting cross-examination shall belong to every party as to the witnesses called against the party. . . ."). Here, the trial court expressly gave Johnson the opportunity to cross-examine Slayton about the events to which Slayton testified, but Johnson expressly declined to do so. As a result, Johnson cannot show that he was improperly deprived of his right to confront

---

[4] The State argues that we should review this enumeration only for plain error because Johnson did not expressly assert his right to confrontation when he moved to strike Slayton's testimony. But we need not address whether to review Johnson's claim under our ordinary standard of review or the more stringent "plain error" standard; as discussed below, Johnson has not shown any error, plain or otherwise, and so his claim fails under either standard of review. *See Barton-Smith v. State*, 309 Ga. 799, 804 n.6 (848 SE2d 384) (2020) (declining to decide whether defendant preserved his claim of error because the alleged error was harmless under both the ordinary standard of review and the plain error standard).

10

Slayton. See, e.g., *Rice v. State*, 281 Ga. 149, 151 (635 SE2d 707) (2006) (defendant was not denied his right to confrontation because he "was afforded a sufficient opportunity for cross-examination," and "the lack of cross-examination in this case is the result of his waiving that opportunity"); *Sherrell v. State*, 274 Ga. 431, 432 (554 SE2d 726) (2001) ("'By refusing to cross[-]examine, defense counsel waived any right to object based on a denial of cross[-] examination.'") (quoting *Lively v. State*, 237 Ga. 35, 36 (226 SE2d 581) (1976)); *Green v. State*, 298 Ga. App. 17, 24 (679 SE2d 348) (2009) (defendant was not denied the right of confrontation where the witness was available for cross-examination "but defense counsel expressly declined the opportunity to cross-examine him").[5]

---

[5] To support his claim, Johnson relies primarily on *Soto v. State*, 285 Ga. 367, 368 (677 SE2d 95) (2009), in which we stated that, "when a witness refuses to continue to testify after having already done so, the proper remedy is to strike pertinent portions of the witness' testimony." This statement, however, refers to a scenario where the witness refuses to testify *on cross[-]examination*. See id. at 368-369 (2) ("As it is said: '(W)hen a witness declines to answer on cross examination certain pertinent questions relevant to a matter testified about by the witness on direct examination, all of the witness' testimony on the same subject matter should be stricken.'") (quoting *Smith v. State*, 225 Ga. 328, 331 (168 SE2d 587) (1969)). See also *Cody v. State,* 278 Ga. 779, 780-781 (609 SE2d 320) (2004) ("If the witness's refusal to answer . . . denies a party a

11

Johnson argues that an attempt to cross-examine Slayton would have been futile. See *Green*, 298 Ga. App. at 25 ("In some instances, the failure to cross-examine may not waive a confrontation clause claim because it is clear from the record that an attempt at cross-examination would have been futile."). But the record here does not clearly show that Slayton would have refused to answer questions on cross-examination about the testimony that he already had given. That testimony dealt primarily with background information and did not delve into the crimes at issue, and there is no indication that Slayton would have refused to answer similar background questions posed by Johnson's counsel. Thus, we cannot say that an attempt to cross-examine Slayton would have been futile. Johnson's enumeration therefore fails.

thorough and sifting cross-examination of the specifics of the witness's testimony on direct, then the trial court is authorized to strike that witness's direct testimony."). Indeed, in *Soto*, the witness "refused to answer questions posed by the defense" and "continued to refuse to answer questions even after the trial court ordered him to do so and threatened to hold him in contempt." *Soto*, 285 Ga. at 368. Here, by contrast, Slayton invoked his Fifth Amendment privilege on direct examination, when the prosecution began asking him about the crimes at issue, and Johnson's lawyer declined to conduct any cross-examination. Johnson's reliance on *Soto* is therefore unavailing.

3. As an alternative to his confrontation claim, Johnson contends that he received ineffective assistance of counsel because, he says, his trial lawyer failed to obtain a proper ruling on his motion to strike, did not otherwise attempt to exclude Slayton's testimony, and did not attempt to cross-examine Slayton about the testimony he already had given. Johnson's claims, however, fail.

To prevail on a claim of ineffective assistance of counsel, a defendant generally must show that counsel's performance was constitutionally deficient and that the deficient performance resulted in prejudice to the defendant. See *Strickland v. Washington*, 466 U.S. 668, 687-695 (104 SCt 2052, 80 LE2d 674) (1984); *Wesley v. State*, 286 Ga. 355, 356 (689 SE2d 280) (2010). To satisfy the deficiency prong, a defendant must demonstrate that his attorney "performed at trial in an objectively unreasonable way considering all the circumstances and in the light of prevailing professional norms." *Romer v. State*, 293 Ga. 339, 344 (745 SE2d 637) (2013); see also *Strickland*, 466 U.S. at 687-688. This requires a defendant to overcome the "strong presumption" that trial

13

counsel's performance was adequate. *Marshall v. State*, 297 Ga. 445, 448 (774 SE2d 675) (2015) (citation and punctuation omitted). To carry the burden of overcoming this presumption, a defendant "must show that no reasonable lawyer would have done what his lawyer did, or would have failed to do what his lawyer did not." *Davis v. State*, 299 Ga. 180, 183 (787 SE2d 221) (2016). "In particular, decisions regarding trial tactics and strategy may form the basis for an ineffectiveness claim only if they were so patently unreasonable that no competent attorney would have followed such a course." Id. (citation and punctuation omitted). To satisfy the prejudice prong, a defendant must establish a reasonable probability that, in the absence of counsel's deficient performance, the result of the trial would have been different. *Strickland*, 466 U.S. at 694. "If an appellant fails to meet his or her burden of proving either prong of the *Strickland* test, the reviewing court does not have to examine the other prong." *Lawrence v. State*, 286 Ga. 533, 533-534 (690 SE2d 801) (2010).

Here, Johnson has failed to show that his trial counsel performed deficiently in declining to cross-examine Slayton. To begin, Johnson did not call his trial lawyer to testify at the hearing on his motion for new trial, and we have stated that, where "trial counsel does not testify at the motion for new trial hearing, it is extremely difficult to overcome the presumption that counsel's conduct resulted from reasonable trial strategy." *Charleston v. State*, 292 Ga. 678, 684 (743 SE2d 1) (2013) (citation and punctuation omitted). Johnson does not explain, and the record does not show, how cross-examination would have been particularly helpful to him — especially given that much of Slayton's testimony pertained only to background information and did not delve into the crimes at issue. Indeed, cross-examination might have produced more background evidence linking Johnson to his accomplices, or it might have led Slayton to reconsider his invocation of the Fifth Amendment and could have opened the door to the prosecutor asking about the charged crimes on redirect examination. Johnson's counsel reasonably could have viewed Slayton's refusal to testify as

a benefit counsel did not want to risk undermining. Thus, Johnson has not overcome the presumption that his lawyer's decision not to cross-examine Slayton was reasonable trial strategy. See *Sullivan v. State*, 301 Ga. 37, 41 (799 SE2d 163) (2017) ("[A] matter such as the cross-examination of a witness is most often grounded in matters of trial tactics and strategy and, in those instances, provides no basis for finding counsel's performance deficient.") (citation and punctuation omitted); *Lawrence*, 286 Ga. at 534 ("[T]rial counsel's decision not to cross-examine certain State's witnesses was reasonable trial strategy and did not amount to ineffective assistance.").

Moreover, Johnson's trial counsel was not deficient for not pursuing the motion to strike Slayton's testimony. Because defense counsel received an opportunity to cross-examine Slayton but made a strategic decision not to do so, an attempt to exclude Slayton's testimony would have been meritless. See *Evans v. State*, 306 Ga. 403, 409 (831 SE2d 818) (2019) ("[T]rial counsel cannot be deficient for failing to file a meritless motion . . . ."); *Hampton v. State*, 295

Ga. 665, 670 (763 SE2d 467) (2014) ("[T]he failure to make a meritless motion or objection does not provide a basis upon which to find ineffective assistance of counsel.").

Johnson further contends that his counsel at least could have attempted to cross-examine Slayton, and if Slayton had refused to testify, then counsel could have renewed the motion to strike, which the trial court would have granted. As mentioned above, however, it was reasonable trial strategy for Johnson's counsel to leave Slayton's testimony as it was, rather than to risk eliciting additional, potentially damaging testimony. And even if trial counsel rendered deficient performance by neglecting to confirm with Slayton whether he would agree to cross-examination, Johnson has failed to show prejudice under *Strickland*; he has offered no evidence — only pure speculation — that Slayton would have refused to testify on cross-examination. See *Baker v. State*, 293 Ga. 811, 815 (750 SE2d 137) (2013) (to show *Strickland* prejudice, appellant "was required to offer more than mere speculation that, absent the counsel's alleged errors, a different result probably would

17

have occurred at trial") (citation and punctuation omitted); *Whitus v. State*, 287 Ga. 801, 805 (700 SE2d 377) (2010) ("Speculation is insufficient to satisfy the prejudice prong of *Strickland*.") (citation and punctuation omitted). Accordingly, Johnson has failed to establish that he was deprived of the effective assistance of counsel with regard to Slayton's testimony.

4. Johnson also contends, in several enumerations of error, that the trial court erred when it admitted certain evidence obtained from a search of his cell phone. The record shows that, after the Ingles robbery, Johnson voluntarily came to the police station for an interview, which began shortly after midnight on September 6. While Johnson — who was not under arrest at that point — was in the interrogation room, the interviewing officer observed Johnson receiving calls or text messages on his iPhone, so the officer asked to see the phone. Johnson handed the phone to the officer, who saw that someone named "Tye" was contacting Johnson. At one point, the officer took the iPhone outside the interrogation room and looked at the recent-call log and contact list. Johnson initially had been

18

treated as a victim, but officers began to suspect that he actually was a participant in the robbery based on his calm demeanor (as compared to Turpin's) and certain inconsistencies in his statements. Eventually, at 9:40 a.m., another officer obtained a search warrant for Johnson's phone.

Before trial, Johnson filed a motion to suppress all evidence derived from his phone, claiming that the pre-warrant search and seizure of his phone during interrogation was illegal and that the warrant itself was invalid because it was issued based on information recovered from the warrantless search of the phone. After a hearing, the trial court granted Johnson's motion in part, suppressing "all information and data obtained from Johnson's iPhone prior to 9:40 a.m. on September 6, 2010" — i.e., all information obtained from the phone before a search warrant was issued — prohibiting the State "from presenting any witness testimony discussing any of the phone numbers or other data appearing on Johnson's iPhone that was collected prior to 9:40 a.m." The trial court also determined, however, that because the search

warrant for the phone was valid, it was not the "fruit of the poisonous tree." Thus, the trial court denied Johnson's motion to suppress evidence recovered from the post-warrant search of the phone.

At trial, the State presented evidence — over Johnson's objection — that Adside was contacting Johnson's phone repeatedly after the Ingles robbery and that, in the afternoon following the robbery, officers used Adside's number to track Adside's phone to the Mall of Georgia, where Adside and two other people (Jackson and McMillan) were arrested as they entered Johnson's car. Johnson raises three claims of error pertaining to this evidence.

(a) First, Johnson argues that the trial court should have excluded testimony that Adside had called Johnson repeatedly after the Ingles robbery because, Johnson says, the trial court previously ruled that this evidence was inadmissible because it was obtained from a pre-warrant search of his phone. We disagree. Although the trial court suppressed the evidence obtained from the pre-warrant search of Johnson's phone, the court declined to suppress any

20

evidence retrieved from the phone *after* the issuance of the search warrant. The court also found that Adside's phone number was obtained from a forensic analysis of the phone *after* the search warrant was issued, and this finding is supported by the investigating officers' testimony. See *State v. Gates*, 308 Ga. 238, 250 (840 SE2d 437) (2020) ("We review the trial court's findings of fact under the clearly erroneous standard, meaning that we uphold a factual finding if there is any evidence in the record to support it."). See also *Douglas v. State*, 303 Ga. 178, 181 (811 SE2d 337) (2018). Because the evidence about which Johnson complains was derived from a *post-warrant* search of the phone, its admission did not violate the trial court's suppression order.

(b) Johnson further challenges the validity of the search warrant itself, contending that there was no probable cause to issue the warrant for his phone. Specifically, Johnson argues that the affidavit used to obtain the warrant failed to specify with particularity the items to be searched, failed to allege a sufficient connection between the phone and the crimes at issue, and

21

improperly relied on tainted information obtained during the illegal search of the phone. We again disagree.

To determine whether probable cause exists to issue a search warrant, the task of the magistrate judge evaluating an application for a search warrant "is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." *State v. Palmer*, 285 Ga. 75, 77 (673 SE2d 237) (2009) (citation and punctuation omitted). On appellate review, our duty "is to determine if the magistrate had a 'substantial basis' for concluding that probable cause existed to issue the search warrant." Id. at 78 (citation and punctuation omitted). Moreover, "a magistrate's decision to issue a search warrant based on a finding of probable cause is entitled to substantial deference by a reviewing court." *Glispie v. State*, 300 Ga. 128, 132 (793 SE2d 381) (2016) (citation and punctuation omitted).

Here, the affidavit used to apply for the warrant for Johnson's phone described the applying officer's training and experience in law enforcement; recited the facts of the Ingles robbery, including a description of Johnson's actions suggesting that he opened the store's security door to allow the other perpetrators inside; and stated that a "black in color I-phone 8gb" was found in Johnson's possession at the time of the incident. The affidavit further stated that,

> [d]ue to variations in [Johnson's] account of the events of September 4, and 5, 2010 as compared to the statements of other witnesses, the inconsistencies in his statements regarding [the meeting at the Waffle House near Ingles], the violation of store policy, and his presence inside the store at the time of David Casto's death, Affiant has probable cause to believe that [Johnson] caused the death of David Casto.

The affidavit concluded that, "[b]ased on your Affiants [sic] training, knowledge and experience in the field of cellular phone forensics your affiant knows that evidence of Armed Robbery and Murder" may be revealed by a search of the phone. Among other things, the warrant application sought "all evidence of Armed Robbery and

23

Murder recovered from the aforementioned I-phone," including "contact lists, call histories," and "any other data stored on the phone."

Given all of this, we conclude that the officer's affidavit provided a "substantial basis" for the magistrate to determine that probable cause existed for the issuance of a warrant for Johnson's phone. See *Palmer*, 285 Ga. at 77. The affidavit described with sufficient particularity the phone to be seized and the data to be collected from that phone, which was limited to evidence of armed robbery and murder. See *Rickman v. State*, 309 Ga. 38, 42 (842 SE2d 289) (2020) (search warrants did not lack sufficient particularity where, "read as a whole," they "limited the search of the contents of [defendant]'s cell phones to items reasonably appearing to be connected to [victim]'s murder"); *Westbrook v. State*, 308 Ga. 92, 98 (839 SE2d 620) (2020) ("[T]he use of the phrase 'electronic data' was specific enough to enable a prudent officer to know to look for photographs and videos stored on [defendant]'s cell phone."); *Reaves v. State*, 284 Ga. 181, 185 (664 SE2d 211) (2008) (a

warrant authorizing a search "for specified items of potential evidence, as well as for 'other related items to the crime of murder' or for 'any other fruits of the crime of murder,' is sufficiently particular and does not authorize a general search in violation of the Fourth Amendment") (citations omitted). See also *Hourin v. State*, 301 Ga. 835, 844 (804 SE2d 388) (2017) ("The degree of the description's specificity [in the search warrant] is flexible and will vary with the circumstances involved.") (citation and punctuation omitted). The affidavit also alleged a sufficient connection between the phone and the crimes at issue. The facts laid out in the affidavit showed that several people were involved in the robbery and that Johnson helped the robbers enter the store through the back door. It was reasonable to infer from these facts that Johnson likely used his phone to communicate with the other perpetrators. See *Taylor v. State*, 303 Ga. 57, 61 (810 SE2d 113) (2018) ("[A] magistrate may draw 'reasonable inferences . . . from the material supplied to him by applicants for a warrant.'") (quoting *Illinois v. Gates*, 462 U.S. 213, 240 (103 SCt 2317, 76 LE2d 527) (1983)); *Glispie*, 300 Ga. at

25

133 ("In light of the facts and circumstances detailed in the search warrant application, it was reasonable for the magistrate to infer that the cell phones in [defendant]'s possession at the time of his arrest were used as communicative devices with third parties for drug deals.").

Finally, nothing in the affidavit references the information derived from the pre-warrant search of Johnson's phone, and so the trial court properly concluded that the evidence obtained pursuant to the warrant was not, as Johnson claims, the "fruit of the poisonous tree." See *Reaves*, 284 Ga. at 183 (search warrants were not tainted by an earlier, warrantless search because "no information obtained during a warrantless search was used to obtain the warrants"). See also *United States v. Barron-Soto*, 820 F3d 409, 415-416 (11th Cir. 2016) (evidence derived from defendants' cell phones was admissible because, although the initial search of the phones was illegal, officers later obtained a warrant for the phones without relying on any information learned during the illegal search). Because the warrant for Johnson's phone was

26

sufficiently particularized and supported by probable cause without the use of tainted evidence, the trial court did not err in denying Johnson's motion to suppress on this ground.

(c) Johnson also contends that the trial court erred in failing to suppress "cell site location data" pertaining to Adside's phone, given that Adside's phone number was found on Johnson's phone. In its suppression order, the trial court made the following finding of fact:

> Investigator Strano . . . faxed a Mandatory Information for Exigent Circumstances Request to Sprint's Legal Compliance department making an "exigent circumstances request" for [Adside's phone number]. The request, which Strano made at *9:34 a.m.*, failed to state a specific exigent description to support the request. The request sought the following information: subscriber information; call detail records with cell site information; and precision location of mobile device (GPS location).

(Emphasis supplied.) The trial court did not expressly rule on the admissibility of the cell site location data, but noted that "Johnson can claim no privacy interest in a cell phone number that was not registered or used by him." See *Hampton v. State*, 295 Ga. 665, 669 (763 SE2d 467) (2014) ("[R]ights under the Fourth Amendment are personal, and in order to challenge the validity of a government

27

search an individual must actually enjoy the reasonable expectation of privacy, that is, the individual must have standing."). On appeal, Johnson argues that Adside's cell site location data should have been suppressed because it was derived from an illegal search of Johnson's phone. He reasons that the cell site data was requested from Sprint at 9:34 a.m., *before* Adside's phone number was legally obtained from Johnson's phone based on the 9:40 a.m. search warrant.

Johnson's claim fails because, even if he could show that the trial court erred in this regard, any such error was harmless beyond a reasonable doubt. See *Ensslin v. State*, 308 Ga. 462, 471 (841 SE2d 676) (2020) (an error of constitutional magnitude "may be deemed harmless if the State can prove beyond a reasonable doubt that the error did not contribute to the verdict") (citation and punctuation omitted). The only evidence introduced at trial relating to Adside's cell site location data was that officers "pinged" Adside's number on the day after the Ingles robbery and tracked his location from McMillan's house to the Mall of Georgia, where he was arrested.

Johnson did not dispute that information at trial, and it did little, if anything, to incriminate Johnson. We thus see "no reasonable possibility that th[is] evidence may have contributed to the verdict," *Ramirez v. State*, 279 Ga. 569, 575 (619 SE2d 668) (2005) (even if the trial court erred in admitting evidence obtained as a result of improper seizure, any such error was "harmless beyond a reasonable doubt" because the evidence did not pertain to a disputed issue at trial), and Johnson's contention therefore fails. See also *Hill v. State*, __ Ga. __ (850 SE2d 110) (2020) (admission of cell site location data, even if erroneous, was harmless error).

5. Johnson contends that the trial court erred when it failed to suppress the evidence gathered from a search of his house at 3555 Ballybandon Court and a search of his car — a black Nissan Altima. The house and car were searched using separate warrants, and these searches yielded incriminating evidence that was introduced at trial. Johnson argues that the affidavit supporting the warrant for his house contained no facts to show that he lived at the

residence, and that the warrant affidavit for his car failed to show that he owned the car. We are not persuaded.

The warrant affidavit for Johnson's home stated that, during a police interview, Johnson eventually admitted to being involved in the Ingles, Waffle House, and Chevron robberies, and that "the clothing worn by him during the Chevron and Waffle House Armed Robberies would be located in his residence . . . ." The affidavit further stated that, on September 6, 2010, the affiant "conducted a drive by of 3555 Ballybandon Court . . . . This is the residence of Sherod [sic] Johnson."

The search warrant affidavit for Johnson's car likewise recounted his confession, including his admission that "he gave the shotgun" to Adside, that Johnson "loaned his vehicle" to Adside, that Adside drove Johnson to Ingles, and that Adside used the vehicle "in the commission of the crime." Further, according to the affidavit, Johnson identified Adside and Jackson as among his co-conspirators "involved in the Armed Robberies" and that Johnson "believes that [Adside] is in possession of his vehicle." Moreover, the affidavit

indicated that, right before Adside and Jackson were arrested at the mall, "[t]hey entered a 2005 Nissan Altima . . . Georgia registration BJU4394 and [VIN] registered to Zora Johnson," and "a large sum of currency was found in their possession."

We conclude that the affidavits contained sufficient information to give the magistrate probable cause to conclude that items related to the robberies would be found at 3555 Ballybandon Court and in the Nissan Altima. See *Taylor*, 303 Ga. at 62 (the magistrate, "making a practical and common-sense decision, was entitled to infer that there was a 'fair probability'" that defendant lived at the address listed in the warrant application); *Carter v. State*, 283 Ga. 76, 77 (656 SE2d 524) (2008) (the "test for probable cause is not hypertechnical," but "must be based on the factual and practical considerations of everyday life on which reasonable and prudent" people act) (citations and punctuation omitted). Because the search warrants for Johnson's house and car were supported by probable cause, the trial court did not err in denying Johnson's motion to suppress the evidence found using those warrants.

31

*Judgment affirmed. Melton, C. J., Nahmias, P. J., and Boggs, Peterson, Bethel, Ellington, and McMillian, JJ., concur.*

DECIDED JANUARY 11, 2021.
Murder. Forsyth Superior Court. Before Judge Bagley.
*Clark & Towne, Jessica R. Towne*, for appellant.
*Penny A. Penn, District Attorney; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Eric C. Peters, Michael A. Oldham, Assistant Attorneys General*, for appellee.