FINAL COPY
294 Ga. 579

S13A1842. DUBOSE v. THE STATE.

HINES, Presiding Justice.

Kenneth Dubose appeals from his conviction and sentence for the felony murder of Roscoe Harris, while in the commission of aggravated assault. For the reasons that follow, we affirm.[1]

Construed to support the verdict, the evidence showed that Dubose was an associate of Lamont Armstrong, who was the brother of Harris's wife. On June 9, 2006, after seeking him for more than a year, law enforcement officers arrested Armstrong on a variety of drug and assault charges. Harris worked as a jailer for the Telfair County Sheriff, and Armstrong considered him to blame for Armstrong's arrest. After the arrest, Shenerica Clark, Armstrong's girlfriend, moved into Harris's home; she kept in contact with Armstrong, who

---

[1] Harris was killed on June 16, 2006. On August 21, 2006, a Telfair County grand jury indicted Dubose, along with Lamont Armstrong and Shenerica Clark, for malice murder. Dubose was tried alone before a jury March 27-30, 2007, found guilty of felony murder while in the commission of aggravated assult, and on March 30, 2007, was sentenced to life in prison for that crime. Dubose moved for a new trial on April 23, 2007; he amended the motion on August 11, 2009, February 9, 2010, February 10, 2010, February 11, 2010, and finally on March 30, 2010. On June 17, 2013, the motion, as amended, was denied. On July 12, 2013, Dubose filed a notice of appeal; the appeal was docketed in this Court for the September 2013 term and submitted for decision on the briefs.

had secured a cell phone despite being in jail. At least once after Armstrong's arrest, Dubose was inside the Harris home with Clark.

On the night of the shooting, Dubose went into Harris's house, and into the master bedroom, where Harris, his wife, and baby were asleep; Harris was positioned with his head at the foot of the bed, toward the door. Dubose turned on the light, and fatally shot Harris once in the head; he then fled through the living room of the house and out the front door. Harris's wife, who had taken a powerful pain-relieving pill, awoke to find the bedroom light on, and Harris on the bed; he had a bullet hole in his head and was positioned as though he had sat up from lying down, and was falling back.

Armstrong testified that, by cell phone, he directed Dubose to go to Harris's home on the night of the shooting to scare Harris by shooting him in the leg; shortly before the shooting, Armstrong told Clark to open the door to the house. Cell phone records showed numerous calls between the cell phones of Clark, Dubose, and Armstrong before and after the shooting.

Clark testified that she did not open the door to the house and did not know how Dubose entered. She also testified that Dubose called her just before the shooting and asked her why the children in the house were still up; she then

2

took at least one child to a bedroom and went to her own bedroom and covered her head with blankets, as she knew that Dubose would soon shoot Harris. When the shot was fired, she emerged from the bedroom, asked a child what had happened, and saw a man running from the house; she could not see his face, but identified Dubose by his "body figure."

After being given his *Miranda*[2] warnings, Dubose gave a custodial statement to Agent Durden of the Georgia Bureau of Investigation; in it, Dubose admitted shooting Harris for fear of Armstrong, but said he thought he was shooting him in the leg, as it was dark in the bedroom. At trial, Dubose produced an alibi witness who testified that he went to Dubose's residence to buy marijuana and was conversing there with him during the time that Harris was killed; Dubose testified that he had not mentioned this witness to Durden, believing that the information was best saved for his defense attorney. Dubose also testified that he was approached about shooting Harris to scare him, but refused, and that on the night of the shooting, he had lent his cell phone to Quinton Johnekins; by the time law enforcement officers arrived at his residence after the shooting, Johnekins had returned to the residence and the cell phone

---

[2] *Miranda v. Arizona*, 384 U. S. 436 (86 SCt 1602, 16 LE2d 694) (1966).

3

was then inside the residence. He also testified that he was lying when he told Durden that he had attempted to shoot Harris on an earlier date, but did not when a child appeared outside the home.

1. The evidence authorized the jury to find Dubose guilty beyond a reasonable doubt of the crime of which he was convicted. *Jackson v. Virginia*, 443 U. S. 307 (99 SCt 2781, 61 LE2d 560) (1979).

2. Dubose contends that the trial court erred in denying his motion to suppress the written statement he gave to Agent Durden on June 18, 2006. An audio recording of the interview during which the statement was made was introduced at the *Jackson v. Denno*[3] hearing and played for the court, and then introduced into evidence at trial and played for the jury.[4] During the interview, Dubose apparently asked whether Durden[5] could "find out about giving me a lawyer now. I can't talk to nobody. I don't even think my mama (and them) know where I'm at."[6] Durden assured Dubose that his parents did know where

---

[3] *Jackson v. Denno*, 378 U. S. 368 (84 SCt 1774, 12 LE2d 908) (1964).

[4] The recording was not transcribed.

[5] Extraneous noise makes Dubose's speech on the recording unclear.

[6] In a prior interview, Dubose, who was 21 years of age, had expressed the desire to speak with his mother.

he was, told Dubose that lawyers "come around" through the jail, and that he could talk with one. Durden then said that, since Dubose had "mentioned talking to a lawyer," the rules were "clear," and that if Dubose wanted to talk to a lawyer before speaking with Durden any further, Durden needed to "make sure they were clear on that"; he also said that if Dubose was asking for a lawyer, Durden needed to stop talking to Dubose, but if Dubose wanted to talk more, Durden needed to make sure they were "clear on that." Dubose apparently asked what Durden would do in his place,[7] and Durden said that he could not discuss that until it was clear whether Dubose was asking for a lawyer, or wished to talk further. Dubose responded that he would talk further, was not asking for a lawyer right now, but was "gonna need one eventually," and that he and Durden could talk more. Later in this interview, Dubose signed a document stating that: he was threatened with being killed if he did not cooperate with Armstrong; on Armstrong's instructions, he shot Harris in what he believed to be the leg; it was dark in the room in which he shot Harris; and, Clark had informed him by cell phone that Harris was inside the home.

Dubose contends that he invoked his right to counsel, that at that point,

---

[7] The recording is not clear on this point.

5

Durden should have ceased the interview, and that everything that transpired during the interview, including the written statement, should have been suppressed. See *Edwards v. Arizona*, 451 U. S. 477, 484-485 (II) (101 SCt 1880, 68 LE2d 378) (1981).

> A suspect who asks for a lawyer at any time during a custodial interrogation may not be subjected to further questioning by law enforcement until an attorney has been made available or until the suspect reinitiates the conversation. If the police persist in questioning a suspect who has requested that counsel be present, any resulting statements made by the suspect are inadmissible in the State's case-in-chief. In order for a suspect to properly invoke his right to counsel during a custodial interrogation, he must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney. (Citations and punctuation omitted.) [Cit.]

*Willis v. State*, 287 Ga. 703, 704 (2) (699 SE2d 1) (2010). "'An invocation must be clear and unambiguous; the mere mention of the word "attorney" or "lawyer" without more, does not automatically invoke the right to counsel.' [Cits.]" *Reaves v. State*, 292 Ga. 582, 586 (2) (b) (740 SE2d 141) (2013).

> [I]f the defendant "makes reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel," cessation of the questioning is not required. *Davis v. United States*, 512 U. S. 452, 459 (114 SC 2350, 129 LE2d 362) (1994).

*Fitz v. State*, 275 Ga. 349, 353 (3) (b) (566 SE2d 668) (2002) (Emphasis supplied).

Such an unclear reference to an attorney is what occurred here. Dubose's mention of a lawyer was coupled with what appeared to be a renewal of his request to speak with his family, and it was uncertain what he was communicating; Durden proceeded to clarify that uncertainty, and Dubose clearly stated that he did not wish to speak with a lawyer at that point, but anticipated wanting one later. See *Reaves*, supra at 586-587.[8]

3. At the time of trial, the Telfair County courthouse was undergoing renovation, the courtroom available therein was deemed inadequate, and consequently Dubose's trial was held in the Wheeler County courthouse. OCGA § 15-6-18, as in effect at the time of trial, and specifically OCGA § 15-6-18 (c) (1),[9] required essentially two things for a criminal trial in a county the size

---

[8] "[F]ollowing a *Jackson v. Denno* hearing, this Court will not disturb the trial court's factual and credibility determinations unless they are clearly erroneous. [Cit.]" *Wright v. State*, 285 Ga. 428, 432 (2) (677 SE2d 82) (2009). Although the issue of invocation of the right to counsel was not the focus of the *Jackson v. Denno* hearing, in ruling on Dubose's motion, the trial court stated: "I find no problems with *Miranda* warnings being given at the appropriate opportunity and the waiver forms indicating that the defendant did not want a lawyer. There is no indication he ever asked for a lawyer."

[9] Then OCGA § 15-6-18 read:

(a) If for any cause it shall or may be impracticable to hold any session or

sitting of any superior or state court at the courthouse or other place provided by law therefor, it shall be lawful to hold court and any session or sitting thereof at such place as the proper authorities of the county in and for which the court is to be held may from time to time provide for such purpose, provided that except as provided in subsection (b) of this Code section no session or sitting of any superior court may be held under this subsection at any place other than the county site of the county of such court.

(b) The provisions of this subsection shall apply only in a county in which there exists a state court with one or more courtrooms regularly utilized by the state court outside the county site. In any such county any session of superior court may be held outside the county site in a courtroom of the state court, subject to the following conditions and limitations:

(1) The senior judge or chief judge of superior court (such terms meaning the active judge who is senior in time of service) must enter a written order for such session of superior court to be so held outside the county site, and such order must incorporate a written finding that it is impracticable for the session of court to be held at the county site;

(2) A judge of the state court must enter a written order consenting for such session of superior court to be held in the courtroom of the state court;

(3) The holding of superior court sessions shall not affect the place of filing of documents to be filed with the superior court, except for documents filed in open court which may be filed where the session of court is held; and

(4) Any state court making courtroom space available to the superior court under this subsection shall be authorized under the same rules to hold sessions of state court in facilities of the superior court.

(c) Notwithstanding the provisions of subsections (a) and (b) of this Code section:

(1) In each county of this state having a population of not more than 50,000 according to the United States decennial census of 1990 or any future such census, if for any cause it shall or may be impractical to hold any session or sitting of any superior or state court at the courthouse or other place provided by law therefor or if it should appear to the governing authority of the county that the best interest of the public would be served by the furnishing of alternate or additional facilities for the holding of any session or sitting of any superior or state court, it shall be lawful to hold court and any session or sitting thereof at such place or places as the governing authority of the county in and for which the court is to be held may from time to

8

of Telfair County to be held in a location other than the county courthouse of that county: provision for such a location by the proper governing authority of the county, and the consent of the accused. Although the record shows that Dubose consented to the move, nothing in the record on appeal shows a proper resolution by the County Board of Commissioners authorizing the action. However, a failure to show full compliance with then-OCGA § 15-6-18 (c) (1) does not establish reversible error; harm from the irregularity must also be shown. *Goodman v. State*, 293 Ga. 80, 83 (2) (742 SE2d 719) (2013).

Dubose fails to show any such harm. In this Court, Dubose asserts that,

time, by appropriate resolution, provide for such purpose, provided that no session or sitting of any superior court or state court may be held under this subsection at any place that is not open to and accessible by the public; provided, further, that no criminal jury trial shall be conducted in such alternate or additional facility without the consent of the accused; and

(2) In each county of this state where the county site is located in an unincorporated area of the county and the governing authority of such county determines by appropriate resolution that the best interest of the citizens of such county would be served by the construction of a courthouse annex or satellite courthouse outside the county site, it shall be lawful to hold any session or sitting of superior or state court or grand jury and to conduct all other related business of the courts at such annex or satellite courthouse.

(d) All acts of a superior court or state court done at a place provided therefor by the county authorities, other than at the county courthouse or other place of holding such court as fixed by law, shall have the same force and effect as if the same had been done at the regular courthouse or other place fixed by law for the holding of such court, including the satisfaction of the requirements of Code Section 15-6-17.

9

had trial been held in the Telfair County courthouse, certain evidence that appellate counsel believes might have been useful would have been readily at hand. However, he raised the issue of noncompliance with then-OCGA § 15-6-18 (c) (1) in an amendment to his motion for new trial, but at the hearing thereon, he produced no evidence that the conduct of his trial was negatively impacted by the change in location, and thus fails to establish any harm thereby.

4. Dubose asserts that, after trial, the State destroyed a videotape from a convenience store that depicted a police informant and another person together near the time of the murder, and posits that the State destroyed the videotape to protect the informant, who was the true killer of Harris.

> In dealing with the failure of the state to preserve evidence which might have exonerated the defendant, a court must determine both whether the evidence was material and whether the [State] acted in bad faith in failing to preserve the evidence. *Arizona v. Youngblood*, 488 U.S. 51 (109 SC 333, 102 LE2d 281) (1988). To meet the standard of constitutional materiality, the evidence must possess an exculpatory value that was apparent before it was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means. *California v. Trombetta*, 467 U. S. 479 (104 SC 2528, 81 LE2d 413) (1984). [Cit.]

*Clay v. State*, 290 Ga. 822, 841-842 (5) (C) (725 SE2d 260) (2012). And

10

Dubose fails to show either materiality of the evidence or bad faith by the State. No evidence was presented that the claimed informant actually appeared on the videotape; the tape was available at trial, and trial counsel testified that, to his recollection, the tape quality was such that nothing of value could be discerned from it. Further, Dubose fails to show that the State acted in bad faith in destroying the tape. Id.

5. The trial court instructed the jury on the law of witness identification and that it was for the jury to determine whether, under the facts and circumstances of the case, witnesses "sufficiently identif[ied] the defendant beyond a reasonable doubt as the perpetrator of the alleged crime or that he was a party to it."[10] Dubose contends the reference to being a party to the crime was error because no eyewitness identified anyone but Dubose, and that identification was simply false. However, in addition to her testimony that it was Dubose she saw running from the home immediately after the shooting, Clark testified that Dubose called her cell phone shortly before the shooting and asked why the children were still up. The defense attacked the credibility of Clark's eyewitness identification, elicited testimony that Harris's nine-year-old

---

[10] The court also instructed the jury on the law of parties to a crime.

stepdaughter had given a description of the man who ran from the home that conflicted with Clark's identification and with Dubose's appearance, and argued that this discrepancy helped establish reasonable doubt. Given Clark's testimony regarding Dubose's telephone call immediately before the shooting, the jury could infer that, even if her eyewitness identification of him was incorrect, he was working in concert with someone else in an attempt to ensure that the children were not in a position either to be harmed when Harris was shot, or to serve as witnesses. Accordingly, the portion of the jury instruction referring to Dubose being a party to the crime was authorized by the evidence. See *White v. State*, 289 Ga. 511, 513 (2) (712 SE2d 834) (2011); *Mallory v. State,* 271 Ga. 150, 152-153 (4) (517 SE2d 780) (1999).

Nor did the court's determination regarding what jury instructions were authorized by the evidence amount to a comment upon the evidence. See OCGA § 17-8-57.[11] That "'statute is violated only when the trial court's

---

[11] OCGA § 17-8-57 reads:

It is error for any judge in any criminal case, during its progress or in his charge to the jury, to express or intimate his opinion as to what has or has not been proved or as to the guilt of the accused. Should any judge violate this Code section, the violation shall be held by the Supreme Court or Court of Appeals to be error and the decision in the case reversed, and a new trial granted in the court below with such directions as the Supreme Court or Court of Appeals may lawfully give.

instruction, considered as a whole, assumes certain things as facts and intimates to the jury what the judge believes the evidence to be.' [Cit.]" *Simmons v. State*, 291 Ga. 705, 708 (5) (733 SE2d 280) (2012). The court instructed the jury that no ruling, comment, or facial expression of the court's was intended to convey any opinion of the evidence, and if the jury had so construed any such ruling, comment, or facial expression, it was to put that impression aside. Viewed in context, no reasonable juror would construe the court's instruction on identification to be a comment upon the evidence. Id.

6. Finally, Dubose contends that his trial counsel failed to provide effective representation in several respects. In order to prevail on such a claim, he must show both that counsel's performance was deficient, and that the deficient performance was prejudicial to his defense. *Smith v. Francis*, 253 Ga. 782, 783 (1) (325 SE2d 362) (1985), citing *Strickland v. Washington*, 466 U. S. 668 (104 SCt 2052, 80 LE2d 674) (1984). To meet the first prong of the required test, he must overcome the "strong presumption" that counsel's performance fell within a "wide range of reasonable professional conduct," and that counsel's decisions were "made in the exercise of reasonable professional judgment." Id. The reasonableness of counsel's conduct is examined from

13

counsel's perspective at the time of trial and under the particular circumstances of the case. Id. at 784. To meet the second prong of the test, he must show that there is a reasonable probability that, absent any unprofessional errors on counsel's part, the result of his trial would have been different. Id. at 783. "'We accept the trial court's factual findings and credibility determinations unless clearly erroneous, but we independently apply the legal principles to the facts.' [Cit.]" *Robinson v. State*, 277 Ga. 75, 76 (586 SE2d 313) (2003).

(a) Dubose contends trial counsel was ineffective in not fully arguing that the trial court should suppress any and all statements made after he contends that he invoked his right to counsel. See Division 2, supra. However, as outlined above, id., Dubose made no clear invocation of his right to counsel, and thus any failure to make this argument does not provide support for finding trial counsel ineffective. *Nations v. State*, 290 Ga. 39, 44 (4) (d) (717 SE2d 634) (2011).

(b) Evidence of Dubose's interviews with Durden was presented to the jury by playing audio recordings of them. At times during the interviews, Durden told Dubose that he knew Dubose was not telling the truth, and related to Dubose what was said during the investigation by other persons who did not testify at trial. Dubose now contends that trial counsel should have moved to

14

redact these statements. See *Axelburg v. State*, 294 Ga. App. 612, 615-617 (2) (669 SE2d 439) (2008).

First, trial counsel testified during the hearing on the motion for new trial that he wanted the jury to understand "how much browbeating, how much interrogation" had taken place. Given the evidence trial counsel had to combat, including the statement Dubose had given Durden, Dubose fails to show that this was an unreasonable strategy. See *Woods v. State*, 291 Ga. 804, 808 (2) (733 SE2d 730) (2012); *Lambert v. State*, 287 Ga. 774, 776 (2) (700 SE2d 354) (2010).

Further, Dubose fails to show prejudice from the failure to move to redact the interviews. "It is true enough that, generally speaking, '[a] trial witness may not give opinion testimony on ultimate matters within the jury's province, including the defendant's credibility.' [Cit.]" *Butler v. State*, 292 Ga. 400, 405 (3) (a) (738 SE2d 74) (2013) (Footnote omitted). But an interviewer in Durden's position is not offering opinion testimony, but fact testimony about what was, in fact, said during the interviews, even though such statements themselves

contained an opinion. As we have explained before, "law

enforcement interrogations are, by their very nature, attempts to determine the ultimate issue and the credibility of witnesses." [Cit.] "Comments made in such an interview and designed to elicit a response from a suspect do not amount to opinion testimony, even when [testimony reflecting] the comments is admitted at trial." [Cits.]

Id. at 406. To the extent that Dubose now argues that the statements should have been redacted because they were "without probative value or [were] too prejudicial to be admitted," id., he fails to show such. There was probative value in explaining why Dubose's version of events changed, and, under the circumstances, any reasonable juror would have expected that Durden did not believe Dubose's earlier versions of events. Id. at 406-407.

(c) Dubose contends that trial counsel should have objected to what he describes as the illegal seizure of his cell phone when he first went to the police station. However,

"'[w]hen trial counsel's failure to file a motion to suppress is the basis for a claim of ineffective assistance, the defendant must make a strong showing that the damaging evidence would have been suppressed had counsel made the motion.'" Biggs v. State, 281 Ga. 627, 631-632 (642 SE2d 74) (2007) (citation omitted).

Williams v. State, 290 Ga. 533, 535 (2) (a) (722 SE2d 847) (2012). And Dubose fails to meet this burden; although Dubose testified at the hearing on the motion

16

for new trial, he did not address this issue. As the trial court noted in its order on the motion for new trial, the evidence regarding the cell phone's acquisition by law enforcement officers presented at trial, which related to the chain of custody, did not show that it was illegally seized.

(d) Dubose contends that trial counsel should have secured the testimony of Harris's nine-year-old stepdaughter, or of the law enforcement investigator who interviewed her. Dubose speculates that she could have testified that she knew him and did not recognize him as the person she saw on the night of the murder. However, he did not produce either the stepdaughter or the investigator to present evidence during the hearing on the motion for new trial, and thus fails to show a reasonable probability that the outcome of his trial would have been different if trial counsel had secured the testimony of either witness. See *Crowder v. State*, 294 Ga. 167, 169 (3) (751 SE2d 334) (2013).[12]

Similarly, to the extent that Dubose contends that trial counsel failed to investigate other crimes committed by other persons, so as to show that those persons could have committed the murder of Harris, he has failed to place such

---

[12] The substance of the stepdaughter's statement to the investigator was placed before the jury through the cross-examination of a different investigator, and trial counsel argued that it contributed to showing reasonable doubt. See Division 5, supra.

evidence in the record, and thus fails to show a reasonable probability that the outcome of his trial would have been different if trial counsel had acted as Dubose now contends he should have.  Id.

　　Judgment affirmed.  All the Justices concur.


Decided February 24, 2014.

Murder. Telfair Superior Court. Before Judge Mullis.

John G. Wolinski, Jimmonique R. S. Rodgers, for appellant.

Timothy G. Vaughn, District Attorney, Joshua W. Powell, Assistant District Attorney, Samuel S. Olens, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Ryan A. Kolb, Assistant Attorney General, for appellee.