312 Ga. 1
FINAL COPY

S21A0297. TAYLOR v. THE STATE.

LAGRUA, Justice.

Appellant Micayla Christina Taylor, also known as "Cay Cay," was convicted of felony murder and other crimes in connection with the shooting death of Divante Rodriekus Simmons and the aggravated assault of William Lawton.  On appeal, Appellant raises seven enumerations of error: (1) the evidence was legally insufficient to support her conviction; (2) the trial court erred in denying her motion to suppress; (3) the trial court erred in denying her plea in bar; (4) the trial court erred in giving the State's requested charge on conspiracy over Appellant's objection; (5) trial counsel provided ineffective assistance by failing to object to prospective Juror No. 44 being struck from the jury panel; (6) trial counsel provided ineffective assistance by failing to object to alleged hearsay statements given by Jeston Yates; and (7) trial counsel provided ineffective assistance by allowing admission of testimony regarding

Appellant's request to take a polygraph test.[1]  For the reasons that follow, we affirm Appellant's convictions.

1. Viewed in the light most favorable to the verdicts, the evidence presented at trial showed the following.  Appellant was arrested on February 5, 2016, after being implicated in the February 1, 2016 shootings of Lawton and Simmons.  The shootings occurred in Newton County in an area known as "Gum Tree."  According to Jeston Yates, who lived in the Gum Tree area at the Salem Terrace Apartments, he encountered Appellant at the apartment complex around 10:15 a.m. on the morning of February 1.  Appellant asked

---

[1] The crimes occurred on February 1, 2016.  In April 2016, a Newton County grand jury indicted Appellant for malice murder, felony murder, two counts of aggravated assault (as to Simmons and Lawton), and possession of a firearm during the commission of a felony.  In November 2018, a jury found her guilty of felony murder and the two counts of aggravated assault.  The jury acquitted Appellant of malice murder and the firearm possession count.  The trial court sentenced Appellant to serve life in prison for the felony murder count and 20 consecutive years for the aggravated assault count as to Lawton.  The remaining count of aggravated assault as to Simmons merged with the felony murder count for sentencing purposes.  Appellant filed a motion for new trial on December 18, 2018, which she amended through new counsel on July 5, 2019.  On July 16, 2019, the trial court held a hearing on the motion for new trial.  On October 2, 2019, the trial court denied Appellant's motion for new trial.  Appellant filed a timely notice of appeal on October 31, 2019, and the case was docketed to this Court's term beginning in December 2020 and submitted for a decision on the briefs.

Yates where she could sell some marijuana, and he noticed Appellant had "about five blunts with her," as well as "a 9" handgun. After smoking marijuana with Appellant, Yates told Appellant to go down to Gum Tree Court or Plum Orchard Road, two nearby streets, to sell the marijuana. Yates testified that around 11:00 a.m., Appellant left the apartment complex driving a silver Malibu or Impala. About five to ten minutes later, Appellant returned, telling Yates that she went to Gum Tree Court to make a sale but two men ran off with the marijuana after asking if they could smell it. Yates testified that he left the apartment complex after this conversation because he did not want to get involved.

Reginald West and his son, Demarkcus Jones, who was also known as "Head Head," testified that the same morning, between 10:30 a.m. and 11:00 a.m., they were walking to West's duplex in the Gum Tree area from another part of the neighborhood. As West and Jones approached West's duplex, West noticed a silver Impala parked in front of the neighbor's unit. When the two men neared the driveway, the Impala started to leave but stopped beside West.

3

A man in the driver's seat said to West, "[S]omebody going to pay." West observed that a woman was seated in the front passenger seat of the vehicle.

Yates testified that about an hour or so later, he was walking through the Gum Tree area when Appellant's silver car pulled up next to him. A man was driving the car, and Appellant was seated in the passenger seat. They told Yates to get in the car, and when Yates hesitated, the man drew a gun — the same gun Yates saw Appellant with earlier that morning. Appellant started giving Yates a description of the man who stole her marijuana, saying he was "cross-eyed." Yates testified that he immediately knew Appellant was describing Jones because Jones has a damaged eye and is the only person in the area with an eye like that.[2] Appellant then asked Yates where "Head Head" lived, and Yates said he did not know. According to Yates, the three started driving around the Gum Tree area near West's duplex. Yates heard Appellant call the driver

---

[2] Jones is blind in his left eye and has visible damage to that eye caused by a childhood accident.

4

"Plug," which Yates knew to mean her drug dealer or supplier. The man driving the car told Yates that he and Appellant were "going to handle some business" and "make an example out of them boys down there that night," and "they were going to go riding tonight until they find who did it." At around 1:00 p.m., they dropped off Yates on Plum Orchard Road.

According to West, later that afternoon between 2:30 p.m. and 4:30 p.m., he was standing outside his duplex with his other son, Reggie, and he saw a silver Impala driving up and down the street multiple times. At some point during this timeframe, the car pulled into West's driveway. The same man and woman from the earlier encounter were inside the vehicle, and the man said to West and Reggie, "I know y'all ain't got nothing to do with this, but when I come back, they going to have to pay, give me my money."

Tobias Dickerson, a resident of the Salem Terrace Apartments, also testified at trial. According to Dickerson, at approximately 5:30 p.m. on the same day, he was walking up a path from Plum Orchard Road to the Salem Terrace Apartments with his young daughter. As

5

they entered the apartment complex parking lot, Dickerson saw a gray or silver Impala parked nearby — a car he had seen at the complex most of the day. A man was standing outside the driver's side of the car, and a woman was standing on the passenger side. As Dickerson and his daughter approached, the woman pointed a handgun — a ".40-caliber" or a "baby 9" — at them, asking "[W]here he go, where he go?" Dickerson responded that he did not know what she was talking about, and the woman ran to the other side of the apartment complex. Dickerson rushed his daughter into his apartment and came back outside to confront the woman "because she drawed down on [him] and [his] daughter." When he came back outside, the car sped out of the complex. Dickerson then walked to his mother's house on Plum Orchard Road, and while he was standing in the yard, he saw the silver Impala driving up and down the street eight or nine times.

Yates testified that about two hours later, between 7:00 p.m. and 7:30 p.m., he was outside a house on Plum Orchard Road and saw a silver car driving slowly up and down the road. Yates noticed

6

that the car looked like the one he had ridden in earlier in the day with Appellant, and he observed that the same man was driving the car, holding a gun.

West and Jones testified that about 8:30 that evening, they were with their friends Lawton and Simmons at Lawton's home on Gum Tree Court. According to West and Lawton, at around 10:00 p.m., a silver or gray Impala turned down Gum Tree Court, drove past Lawton's house, turned around in the cul-de-sac at the end of the street, and drove back up the street. The men testified that as the Impala neared Lawton's house again, multiple gunshots were fired from the vehicle. Lawton said that Simmons pulled him to the ground behind a car parked in front of the house. West stated he also got down and slammed Jones to the ground. Jones testified that he could see "fire" coming up off the ground where the bullets were hitting the parking area. One of the bullets struck Lawton in his left bicep. Lawton testified that after the shooting stopped, he got up to go inside his house but noticed that Simmons was still on the ground. The men then realized Simmons had been shot.

Officers responded to the shootings at approximately 10:30 p.m. They observed Simmons lying on the ground, apparently deceased. They spoke briefly with Lawton and assisted in applying a tourniquet to his arm. The officers recovered multiple shell casings from a .40-caliber weapon located in the immediate vicinity and along the road.[3] When the ambulance arrived, emergency personnel confirmed Simmons was deceased. The ambulance transported Lawton to the hospital where he was treated and released.

A few days after the shootings, Dickerson, West, and Yates were interviewed by officers. During these interviews, officers presented the men with photographic lineups and asked if they recognized anyone matching the appearance of the woman they encountered on February 1. Dickerson selected a photograph of Appellant and also identified her at trial. West circled a photograph of Appellant, but indicated that he was not sure she was the woman he encountered on February 1. However, West positively identified

---

[3] Officers never recovered the handgun used in the shootings.

Appellant at trial. Yates could not identify anyone in the photographs presented to him, but at trial, he identified Appellant as the woman who asked him where she could sell marijuana, had a gun in her possession, and was riding in the silver car.

Appellant was arrested on February 5 and interviewed by Investigator Jocelyn Detweiler and Corporal Charles Cook. The interview lasted approximately four hours. At the beginning of the interview, Appellant agreed to waive her *Miranda*[4] rights and give a statement to the officers.

During the first few minutes of the interview, Appellant told the officers that on the day of the shootings, she "did try to go purchase some weed" in the Gum Tree neighborhood and "somebody did steal from" her. She also told the officers that she was "driving around the neighborhood in the day time" in a silver Impala looking for "Head Head." The officers then asked her to describe Head Head, and Appellant responded, "He got messed up eyes." When the

_____

[4] See *Miranda v. Arizona*, 384 U.S. 436 (86 SCt 1602, 16 LE2d 694) (1966).

officers asked for more details about the events surrounding the robbery, Appellant stated:

> I went to go purchase some weed, I'm gonna be honest, earlier that day. And, he ended up taking it from me. Like, he stole from me. So I just let it go, like, I just roll — at first, I did ride around the neighborhood. I'm not gonna lie. I rolled around the neighborhood. I'm, like, have you all seen — you all seen a dude?

One of the officers then inquired as to what Appellant was planning to do once she found Head Head, and Appellant responded that she was "gonna try to get [the marijuana] back," "was going to chase after him," and "[b]eat him up or something." Appellant also told the officers that "J" was in the car with her the whole time, indicating "J" was her "plug" or supplier. Appellant then stated that around 2:00 or 3:00 p.m., she and "J" drove over to the Salem Terrace Apartments to find Yates to get the name of the man who had stolen the marijuana from her. Appellant said she described the man to Yates and said he had "cock eyes," and Yates told her the man's name was "Head Head." Appellant said she, "J," and Yates then rode around Gum Tree to see if Yates could show them where Head

10

Head lived, but Yates "act like he ain't know where he live. He was just pointing." She said they dropped off Yates after that. Appellant told the officers that she returned to the Gum Tree area throughout the day looking for Head Head because she wanted to "get [her] sack back," and if she saw Head Head "with [her] stuff," she was "going to beat him up."

2. Appellant contends that the evidence presented at trial was insufficient to support her convictions because the State "simply cobbled together circumstantial evidence and the testimony of insufficient and unreliable witnesses" to show that "Appellant was somehow involved in the shooting in the Gum Tree neighborhood that evening." See OCGA § 24-14-6 ("To warrant a conviction on circumstantial evidence, the proved facts shall not only be consistent with the hypothesis of guilt, but shall exclude every other reasonable hypothesis save that of the guilt of the accused."). Appellant claims that while the evidence may have established that on February 1, she was robbed of marijuana and was riding around in a silver or gray Impala in the Gum Tree area, no evidence was presented by

11

the State to place her at the actual scene of the homicide or in possession of the murder weapon or to show that the silver or gray Impala in which she was riding was the same one at the scene of the shootings that night.

However, the evidence presented at trial established that the vehicle in which Appellant was riding on February 1 was the same make, model, and color as the one driven by the assailant during the shootings. Furthermore, several witnesses saw Appellant with a handgun before the shootings, and Yates saw the same handgun in possession of the man driving Appellant's car. Testimony at trial also showed that for most of the day on February 1, Appellant was looking for "Head Head" — the man who allegedly stole marijuana from her — and Appellant's own statements to officers demonstrated that when she found Head Head, she intended to retaliate for the theft.

> It is the jury's role to resolve conflicts in the evidence and determine the credibility of witnesses. Questions as to the reasonableness of hypotheses are generally to be decided by the jury which heard the evidence and where the jury is authorized to find that the evidence, though

12

circumstantial, was sufficient to exclude every reasonable hypothesis save that of guilt, that finding will not be disturbed unless the verdict of guilty is insupportable as a matter of law.

*Smith v. State*, 280 Ga. 161, 162 (1) (625 SE2d 766) (2006) (citations and punctuation omitted).

Here, the State presented evidence that Appellant had a motive for the shootings, that Jones was with the victims at the time of the shootings, that a car matching the description of Appellant's was involved in the shootings, and that Appellant had a handgun with her and in her vicinity during the day of the shootings, which authorized the jury to find that she was at least a party to the crimes. See id. See also OCGA § 16-2-20 (defining "parties to a crime"). Accordingly, the evidence was sufficient to exclude every other reasonable hypothesis save that of guilt and to enable a rational trier of fact to find Appellant guilty beyond a reasonable doubt of the crimes of which she was convicted. See *Smith*, 280 Ga. at 162.

Appellant also contends that no rational trier of fact could have

found her guilty beyond a reasonable doubt of the commission of the alleged crimes under the constitutional standard set forth in *Jackson v. Virginia*, 443 U.S. 307, 319 (99 SCt 2781, 61 LE2d 560) (1979). Properly viewing the evidence in the light most favorable to the verdicts, we conclude that the evidence was sufficient for a jury to find Appellant guilty beyond a reasonable doubt of the crimes of which she was convicted under the *Jackson* standard. See id. See also *Boyd v. State*, 306 Ga. 204, 207 (1) (830 SE2d 160) (2019).

3. Appellant next contends that the trial court erred in denying her motion to suppress a portion of the statements she made during her February 5 custodial interview with Investigator Detweiler and Corporal Cook. An audio recording of the interview was introduced at a pretrial *Jackson-Denno*[5] hearing and played for the court.[6]

As noted above, early in the interview, after knowingly and voluntarily waiving her rights under *Miranda*, Appellant told the

---

[5] See *Jackson v. Denno*, 378 U.S. 368 (84 SCt 1774, 12 LE2d 908) (1964).

[6] A written transcript of the interview was also introduced at the hearing and admitted during trial.

14

officers that she was in the Gum Tree area to sell marijuana on February 1; that a man named Head Head stole her marijuana; and that she was driving around Gum Tree in a silver Impala looking for Head Head to beat him up and get the marijuana back. After making these admissions, about two hours into the interview, Appellant asked the officers:

APPELLANT: *I have a right to a — do I have a right to a lawyer or not? Do I need a — I need an attorney?*
DETWEILER: Do you need an attorney?
APPELLANT: I mean, no, because I'm telling you all what happened. . . .
COOK: So you still want to keep talking to us?
APPELLANT: Huh?
COOK: You confusing me. You still want to keep talking with us?
APPELLANT: I mean, is it a waste of time?
DETWEILER: At — no.
COOK: Cay Cay, only you know that.
DETWEILER: Yeah.
COOK: And I just need to hear it from you, that you want to just keep talking with us and keep moving forward. Because, listen, I wasn't – you know where I was? I was at home in bed. Cause I was sick that day. I ain't going to tell you no story about it. I can tell you exactly what I was doing.
APPELLANT: Okay.
COOK: I was at home in the bed, sweetheart.
APPELLANT: All right. Well, I'm just going to be 100 then.

COOK:  Please.
APPELLANT: All right. So from the —
DETWEILER:  Just —
APPELLANT:  Just hold on.  Just let me talk.

(Emphasis added.)

The interview resumed, and Appellant told the officers again that on the day of the shootings, she was driving around Gum Tree looking for Head Head because she was going to "chase after him" until she got her marijuana back.  Then, about 30 minutes after the exchange quoted above, the following exchange occurred:

COOK:  Describe [your plug] good to us.
APPELLANT:  Naw. *I need my attorney*.
DETWEILER:  Okay.  You wish to not speak with us at this time?
APPELLANT:  I mean, you all going to try and put a murder on me, and I didn't commit.
DETWEILER:  Do you wish to not speak with us at this time?
APPELLANT:  I mean, I'll — I keep talking.  Man, I didn't —
DETWEILER:  Are you sure?
COOK:  Go over it again to make sure.
DETWEILER:  All right now.
APPELLANT:  What?
DETWEILER:  It's all right.
APPELLANT:  So what?
DETWEILER: So I'll let them go into the thing (inaudible).

16

APPELLANT: So what? . . .

COOK:  What we got to do now, Cay Cay, is you — you requested an attorney but then you said you wanted to keep talking.  We got to review these again.

APPELLANT:  For real?

DETWEILER:  Yeah.  You ready?

(Emphasis added.)

At this point, the investigators reviewed Appellant's *Miranda* rights, and Appellant signed the corresponding waiver form and agreed to continue speaking with the investigators.  During the remainder of the interview, Appellant reiterated that on the day of the shootings, she was looking for Head Head in the Gum Tree area to get her marijuana back, but she did not have a weapon and was not involved in or present when the shootings occurred.  She told the officers that she "let it go," and she "didn't go shoot nobody."

Appellant contends that the two statements emphasized above unequivocally invoked her right to counsel, and thus, the interrogation should have stopped until an attorney was made available to her or until she reinitiated the conversation with the officers.  See *State v. Estrada,* 300 Ga. 199, 201 (794 SE2d 103)

17

(2016) ("When a defendant invokes his right to counsel, all interrogation is to cease until such time as an attorney is made available or until such time as the defendant reinitiates conversation with law enforcement and waives his right to having counsel present." (emphasis omitted)). Appellant argues that because the interrogation did not cease after she invoked her right to counsel, her subsequent statements should have been suppressed at trial, and the trial court erred in denying her motion to suppress.

"In reviewing a trial court's ruling on a motion to suppress, this Court must affirm the trial court's findings on disputed facts unless clearly erroneous." *Mack v. State*, 296 Ga. 239, 241 (765 SE2d 896) (2014). Here, however, there are no disputed facts, given that Appellant's custodial interview was captured in an audio recording that is part of the appellate record. See id. "Accordingly, our review of the trial court's application of the law to the undisputed facts is de novo." Id. at 242.

> A suspect who asks for a lawyer at any time during a custodial interrogation may not be subjected to further questioning by law enforcement until an attorney has

been made available or until the suspect reinitiates the conversation. If the police persist in questioning a suspect who has requested that counsel be present, any resulting statements made by the suspect are inadmissible in the State's case-in-chief. In order for a suspect to properly invoke his right to counsel during a custodial interrogation, he must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney.

*Dubose v. State*, 294 Ga. 579, 582 (2) (755 SE2d 174) (2014) (citations and punctuation omitted).  See also *Willis v. State,* 287 Ga. 703, 704 (1) (699 SE2d 1) (2010).  However,

[a]n invocation must be clear and unambiguous; the mere mention of the word "attorney" or "lawyer" without more, does not automatically invoke the right to counsel. If the defendant makes reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel, cessation of the questioning is not required.

*Dubose*, 294 Ga. at 582 (citations and punctuation omitted; emphasis in original).

In this case, Appellant's first reference to a lawyer — "I have a right to a — do I have a right to a lawyer or not? Do I need a — I need an attorney?" — was not an "unequivocal and unambiguous

19

request[ ] to have counsel present during interrogation." *Lee v. State*, 306 Ga. 663, 668 (3) (832 SE2d 851) (2019). See also *United States v. Wysinger*, 683 F3d 784, 795 (II) (A) (7th Cir. 2012) (holding that defendant's initial question — "Do I need a lawyer before we start talking?" — "was not an unequivocal request for a lawyer and [law enforcement] was not required to cease the interrogation at that point."); *Mueller v. Angelone*, 181 F3d 557, 573-574 (III) (4th Cir. 1999) (concluding that the defendant's question, "Do you think I need an attorney here?," which was posed to the police officer during interrogation, was an ambiguous "query whether his interrogator thought that counsel might be helpful" and not "a clear assertion of his right to counsel" (emphasis omitted). "When a defendant makes an equivocal reference to counsel, as [Appellant] did here, interviewing officers are not always required to clarify the request, but they can." *Lee*, 306 Ga. at 668. After Appellant made the equivocal and ambiguous statement inquiring whether she needed an attorney, the officers "reasonably sought clarification" of Appellant's statement, asking several times if Appellant wanted to

keep talking to them. See id. Appellant clearly indicated that she did want to keep talking to the officers. Accordingly, at this point, Appellant did not unambiguously invoke her right to counsel.

Turning now to Appellant's second reference to counsel during the interview, the recording reflects that when officers asked Appellant for a more detailed description of her plug, "J," she responded, "Naw. I need my attorney." Assuming without deciding that this statement was an unequivocal invocation of Appellant's right to counsel and that the officers' subsequent questions violated her Fifth Amendment right to counsel, see *Edwards v. Arizona*, 451 U.S. 477 (101 SCt 1880, 68 LE2d 378) (1981), the trial court's error in admitting the statement was harmless beyond a reasonable doubt because in the remainder of the interview, the information elicited from Appellant was cumulative of other statements she made earlier in the interview when she had been advised of her *Miranda* rights and had not yet made any reference to counsel. See *Frazier v. State*, 278 Ga. 297, 298 (4) (602 SE2d 588) (2004) ("Because [the defendant's] custodial statement merely repeated what he had

21

earlier told his aunt and admitted in his non-custodial statement to the first officer on the scene, admission of the custodial statement was harmless beyond a reasonable doubt even assuming, arguendo, that officers during that interrogation failed to scrupulously honor [the defendant's] right to remain silent."). See also *Ensslin v. State*, 308 Ga. 462, 472 (2) (d) (841 SE2d 676) (2020) (in conducting harmless error analysis after concluding that the appellant invoked his right to remain silent, this Court held "it is clear that the challenged statements were cumulative of [a]ppellant's testimony admitting that he killed [the victim] but claiming self-defense, rendering their admission harmless beyond a reasonable doubt."). Additionally, throughout the entire interview, Appellant consistently denied any involvement in the shootings or knowledge of whom the perpetrator was. For these reasons, even assuming the trial court erred in admitting the challenged statements at trial, this error was harmless beyond a reasonable doubt. See *Ensslin*, 308 Ga. at 474.

4. Appellant's next contention alleges error by the trial court

in denying her plea in bar. On August 18, 2018, Appellant filed a plea in bar, asserting that her constitutional right to a speedy trial had been violated because, following her indictment, the trial of her case was continued from multiple trial calendars, primarily at the State's request. The trial court denied Appellant's plea in bar, determining that the delay in trial was not excessive; that both parties contributed to the delay and each party had specific reasons for the requested continuances; that the Appellant's right to a speedy trial was not asserted until the plea in bar was filed; and that no prejudice to Appellant had been shown. On appeal, Appellant contends that the trial court's ruling was erroneous because at the time she filed her plea in bar, the delay in her trial had been over 30 months, which "clearly harmed her." We see no clear error in the trial court's factual findings or any abuse of discretion in the trial court's weighing of the factors and decision to reject Appellant's speedy trial claim. See *Cash v. State*, 307 Ga. 510, 513 (2) (837 SE2d 280) (2019).

(a) *Threshold inquiry.*

Courts examining an alleged denial of the constitutional right to a speedy trial first must consider whether the interval between the defendant's arrest, indictment, or other formal accusation and the trial is sufficiently long so as to be characterized as presumptively prejudicial. If the delay is long enough to invoke the presumption of prejudice, the trial court must balance four factors: (1) whether the delay before trial was uncommonly long, (2) whether the government or the criminal defendant is more to blame for the delay, (3) whether, in due course, the defendant asserted his right to a speedy trial, and (4) whether [s]he suffered prejudice as the delay's result.

Id. (citing *Barker v. Wingo*, 407 U.S. 514, 530-533 (92 SCt 2182, 33 LE2d 101) (1972); *Doggett v. United States*, 505 U.S. 647, 651 (112 SCt 2686, 120 LE2d 520) (1992)). "The trial court's weighing of each factor and its balancing of all four factors — its ultimate judgment — are reviewed on appeal only for abuse of discretion." *State v. Porter*, 288 Ga. 524, 526 (2) (a) (705 SE2d 636) (2011).

The trial court determined that the pretrial delay in Appellant's case was 30 months — Appellant was arrested in February 2016, filed her plea in bar in August 2018, and was tried in November 2018. Appellant does not contest that the trial court accurately calculated this delay. The trial court properly held that

24

the pretrial delay was presumptively prejudicial, and the court proceeded to consider and weigh the *Barker* factors. See *Barker*, 407 U.S. at 530-533. On appeal, Appellant argues that she was deprived of her right to a speedy trial due to the continuances that delayed her trial, which were predominantly the fault of the government.

The following continuances are reflected in the record: (1) at Appellant's request, the trial court granted a continuance of the June 2016 pretrial motions and status hearing; (2) at the joint request of both parties, the trial court granted a continuance of the pretrial motions hearings scheduled for August 2016 and September 2016; (3) the trial court rescheduled the pretrial motions hearing on March 2017 due to its own conflict; (4) the case appeared on the trial court's October 2017 trial calendar, but was continued at the State's request because Yates, one of the State's witnesses, had absconded; (5) Appellant's attorney filed a motion to withdraw in January 2018, which was granted by the trial court on January 30, 2018;[7] (6)

---

[7] Appellant's private attorney withdrew because Appellant was no longer able to pay for her representation, and new counsel was then appointed by the trial court.

Appellant's new counsel requested a continuance from the February 2018 and April 2018 trial calendars to allow counsel to review the file and prepare for trial, and the trial court granted the requests; (7) the case appeared on the trial court's September 2018 trial calendar, but was continued to November 2018 at the State's request for the State to locate Yates; and (8) the trial court ordered that the trial would proceed in November 2018 with or without the State's witnesses. The trial went forward in November 2018.

(b)   *The Barker Factors.*

(i)   *Length of the Delay.*

As noted above, Appellant does not contest that the length of the delay was properly calculated by the trial court as 30 months. In considering this time period, the trial court held that the delay was not uncommonly long given the nature of the charges and the time period required for investigation. However, the trial court held that the length of delay should be weighed against the State, as the delay amounted to a "little less than three years" from the time of Appellant's arrest to her trial. On appeal, neither party contests the

26

trial court's conclusion, and we conclude that the trial court properly weighed the length of the delay against the State. See *Porter*, 288 Ga. at 527.

(ii) *Reasons for the Delay.*

The trial court considered the reasons for the delay in Appellant's trial and noted that they included requests for continuances by both parties. The trial court thus attributed the delays to the State and Appellant, and we conclude that the trial court did not abuse its discretion in weighing this factor neutrally. See *Robinson v. State*, 287 Ga. 265, 268 (1) (b) (695 SE2d 201) (2010) (concluding that, "in balancing all of the reasons for the delay that [we]re attributable to the State against those that [we]re attributable to the defendant[ ], this *Barker* factor ultimately remains neutral").

(iii) *Assertion of the Right to a Speedy Trial.*

The trial court weighed the third factor against Appellant because she waited 30 months to file a plea in bar asserting her right

27

to a speedy trial. We see no abuse of discretion in the trial court's conclusion that this factor should be weighed against Appellant. See *Cash*, 307 Ga. at 518 ("We do not see an abuse of discretion in the trial court's conclusion that [the defendant's] failure to assert the right sooner weighed against him.").

(iv) *Prejudice.*

The trial court found that Appellant failed to satisfy her burden of showing she was prejudiced by the pretrial delay and failed to demonstrate actual prejudice, and thus, this factor did not weigh in Appellant's favor. See id. at 518-519. On appeal, while Appellant generally asserts that her defense was prejudiced, she does not explain how or provide any concrete basis for this assertion, such as an inability to prepare her defense, the loss of any witnesses, and/or any impairment to her defense. See *Porter*, 288 Ga. at 529 ("The types of prejudice associated with an unreasonable delay before trial include oppressive pretrial incarceration, anxiety and concern of the accused, and the possibility that the accused's defense will be

28

impaired by dimming memories and loss of exculpatory evidence."
(citation and punctuation omitted)). The trial court did not clearly
err in finding that Appellant did not demonstrate actual prejudice
from the delay of her case or abuse its discretion by failing to weigh
the prejudice prong in Appellant's favor. See *Cash*, 307 Ga. at 520.

Accordingly, the trial court did not abuse its discretion in
concluding that Appellant's right to a speedy trial was not violated
and denying her plea in bar.

5. Appellant contends that the trial court erred in instructing
the jury on conspiracy. During the charge conference, the State
requested that the trial court charge the jury on conspiracy, and the
trial court advised that it would give the Suggested Pattern Jury
Instructions on conspiracy and party to a crime. Appellant objected
to the conspiracy instruction — both at the conclusion of the charge
conference and again after the trial court finished reading the
instructions to the jury. On appeal, Appellant contends that because
conspiracy was not the theory under which she was charged and
because the evidence did not support a conspiracy charge in this

case, it was error for the trial court to charge the jury on conspiracy over Appellant's objection. We disagree.

> It is not error to charge on the subject of conspiracy when the evidence tends to show a conspiracy, even if a conspiracy is not alleged in the indictment. The State may prove a conspiracy by showing that two or more persons tacitly came to a mutual understanding to pursue a criminal objective. And the conspiracy may be inferred from the nature of the acts done, the relation of the parties, the interest of the alleged conspirators, and other circumstances.

*Smith v. State*, 306 Ga. 753, 758 (2) (833 SE2d 117) (2019) (citations and punctuation omitted). "And, only slight evidence is necessary to warrant a charge on the subject of conspiracy." Id.

Here, more than slight evidence supported giving a conspiracy instruction to the jury. This evidence included testimony from several witnesses who observed Appellant and a man, whom Appellant referred to as her "plug" or drug supplier, in the Gum Tree area at various points during the day on February 1, 2016, riding in a silver or gray Impala and searching for the man who allegedly stole Appellant's marijuana. Appellant and her associate were also seen with a handgun, with which they threatened both Yates and

Dickerson. The gunshots that caused Simmons's death and Lawton's injuries were fired from a silver or gray Impala matching the description of the car in which Appellant and her associate were traveling. Appellant admitted to police officers that she and her "plug" were looking for the man who stole her marijuana and intended to harm the suspected offender — "Head Head" — when they found him, and Jones was with Simmons and Lawton at the time of the shootings. This evidence constituted the "slight evidence" needed for the trial court to charge the jury on conspiracy, and the trial court did not abuse its discretion in doing so. See id.

6. In Appellant's next three enumerations of error, she contends that her trial counsel provided ineffective assistance in regard to the following: (a) failing to object to a prospective juror being struck prior to voir dire; (b) failing to object to alleged hearsay statements given by Yates; and (c) allowing the admission of testimony regarding Appellant's request to take a polygraph test. We will address each contention in turn, applying the constitutional standard set forth in *Strickland v. Washington*, 466 U.S. 668 (104

31

SCt 2052, 80 LE2d 674) (1984).

In order to prevail on a claim of ineffective assistance of counsel, Appellant must show "both that counsel's performance was deficient, and that the deficient performance was prejudicial to h[er] defense." *Lockhart v. State*, 298 Ga. 384, 385 (2) (782 SE2d 245) (2016). See also *Strickland*, 466 U.S. at 687 (III). To show deficient performance, Appellant must "overcome the strong presumption that counsel's performance fell within a wide range of reasonable professional conduct, and that counsel's decisions were made in the exercise of reasonable professional judgment." *Lockhart*, 298 Ga. at 385 (citation and punctuation omitted).

> The reasonableness of counsel's conduct is examined from counsel's perspective at the time of trial and under the particular circumstances of the case, and decisions regarding trial tactics and strategy may form the basis for an ineffectiveness claim only if they were so patently unreasonable that no competent attorney would have followed such a course.

Id. (citation omitted). See also *Robinson v. State*, 278 Ga. 31, 37 (2) (d) (597 SE2d 386) (2004) ("As a general rule, matters of reasonable trial tactics and strategy, whether wise or unwise, do not amount to

ineffective assistance of counsel," and "[a] reviewing court evaluates trial counsel's performance from counsel's perspective at the time of trial." (citation and punctuation omitted)). To show prejudice under the *Strickland* test, Appellant must show that "there is a reasonable probability that, absent any unprofessional errors on counsel's part, the result of h[er] trial would have been different." *Lockhart*, 298 Ga. at 385 (citation omitted).

"An appellant must prove both prongs of the *Strickland* test, and if [s]he fails to prove one prong, it is not incumbent upon this Court to examine the other prong." *Winters v. State*, 305 Ga. 226, 230 (4) (824 SE2d 306) (2019) (citation and punctuation omitted). "In reviewing either component of the inquiry, all factual findings by the trial court will be affirmed unless clearly erroneous." Id. See also *Robinson v. State,* 277 Ga. 75, 76 (586 SE2d 313) (2003) ("We accept the trial court's factual findings and credibility determinations unless clearly erroneous, but we independently apply the legal principles to the facts." (citation and punctuation omitted)).

(a) Appellant first contends that her trial counsel failed to provide effective assistance in regard to the striking of a potential juror prior to voir dire. As shown by the record, prior to jury selection, the trial court excused prospective Juror No. 44 because there was a warrant outstanding for her arrest, and she was taken into custody. The trial court advised the parties on the record of this juror's excusal and asked if there was any objection. The prosecutor responded, "None," and defense counsel responded, "I guess not. I would have taken her." The trial court inquired further, "But no objection as far as the record?" Defense counsel responded, "There is not, Judge."

On appeal, Appellant contends that Juror No. 44 was improperly excused by the trial court, and Appellant's trial counsel was ineffective for failing to inquire into or object to this juror's removal. During the hearing on Appellant's motion for new trial, trial counsel was asked about her decision not to object to the removal of this juror, as well as her comment that she would have taken the juror. She testified that her comment, "I would have taken

her," was "probably meant somewhat facetiously" because she did not have "any information on that juror," and her understanding was that the juror was taken into custody and was unavailable for jury selection. In denying Appellant's motion for new trial, the trial court determined that trial counsel's decision not to make a meritless objection to the removal of Juror No. 44 was strategic and not constitutionally deficient.

There is a strong presumption that trial counsel's conduct fell within the wide range of what is reasonable, and Appellant bears the burden to show that her counsel's actions were "patently unreasonable." *Lockhart*, 298 Ga. at 386. The evidence brought forth during the motion for new trial hearing shows that Appellant's trial counsel pursued a reasonable strategy in deciding not to object to the dismissal of Juror No. 44 because the juror was in custody and unavailable for jury service. See id. ("Decisions regarding which jurors to strike and which to accept are questions of trial strategy."). We conclude that Appellant failed to show deficient performance under *Strickland*, and thus, this ineffective assistance of counsel

claim fails.

(b) Appellant next contends that her trial counsel was ineffective in failing to object to alleged hearsay statements from Yates, one of the State's key witnesses at trial. During the State's direct examination of Yates, he testified about statements made to him by Shanteria Hicks, a friend of Appellant's, who was supposedly with Appellant on the morning of the shootings. Yates repeated statements Hicks supposedly made regarding the events surrounding the theft of Appellant's marijuana, such as where the theft happened and who committed it. Appellant contends that: (1) this testimony was inadmissible hearsay because Hicks did not testify at trial; (2) no exception to the hearsay rule applied to permit these statements to be introduced through Yates; and (3) trial counsel therefore should have objected to the admission of this testimony.

At the hearing on Appellant's motion for new trial, when trial counsel was questioned about her failure to object to Yates's hearsay testimony, trial counsel explained that she did not expect Yates to

36

testify about Hicks's statements, and the testimony caught her "off-guard." Trial counsel also indicated that she knew she could impeach Yates with information showing that Hicks was incarcerated on the day of the shootings and could not have been present to make these statements to Yates. In the trial court's order denying Appellant's motion for new trial, the trial court found that Appellant failed to demonstrate that her trial counsel's performance fell below the broad range of professional conduct because her decision not to object was not a "professionally unreasonable choice, particularly in considering that she was aware that she could potentially impeach the witness concerning the remarks made." The trial court also found that Appellant failed to establish any prejudice.

At trial, trial counsel thoroughly cross-examined Yates and impeached him with information showing Hicks was incarcerated on the day of the shootings. Officers also testified to Hicks's incarceration on that day. Trial counsel used this evidence in her closing argument to argue to the jury that Yates should not be

believed. In addition, the State elicited testimony from Yates about the statements Appellant made to him following the robbery and about Yates's own interactions with Appellant that day. Appellant also admitted in her custodial interview that she had been robbed of marijuana, and she described the man who robbed her and where it occurred.

Thus, even if we assume without deciding that Yates's testimony at issue was inadmissible hearsay, the admission of these statements was not prejudicial because the testimony was cumulative of other evidence that was properly admitted at trial and was used to impeach Yates. See *Carter v. State*, 310 Ga. 559, 565 (2) (b) (852 SE2d 542) (2020). "In short, this testimony was not detrimental to Appellant." Id.

(c) Finally, Appellant contends that her trial counsel provided ineffective assistance by failing to object to testimony about Appellant's initial refusal and later offer to take a polygraph test. Appellant's claim fails.

As previously noted, the recording of Appellant's February 5,

2016 custodial interview was introduced at trial. During this interview, officers questioned Appellant about whether she wanted to take a polygraph test. Appellant initially declined to take a polygraph test, but later in the interview, she told the officers they could "polygraph" her. At trial, one of the officers testified about this exchange and indicated they decided not to give Appellant a polygraph test. During closing arguments, Appellant's trial counsel pointed to the officers' failure to obtain a polygraph test from Appellant to support the argument that they failed to conduct a thorough investigation in this case.

On appeal, Appellant contends that her trial counsel should have objected to the admission of testimony regarding the polygraph test and requested that the related portions of Appellant's custodial interview be redacted. Appellant argues that because the results of a polygraph test are not admissible at trial unless stipulated to by Appellant, her trial counsel's decision to allow these references to a potential polygraph test to be admitted was deficient performance. See *State v. Chambers*, 240 Ga. 76, 76-77 (239 SE2d 324) (1977). We

39

disagree.

At the motion for new trial hearing, trial counsel testified that her decision not to object to the polygraph test references was strategic. Trial counsel explained that it allowed her to argue to the jury that Appellant explicitly asked law enforcement officers to give her a polygraph test, and they elected not to do so. In denying Appellant's motion for new trial, the trial court found that trial counsel made a reasonable and strategic decision to allow this evidence to be admitted to further the defense's theory of inadequate investigation by law enforcement officers. The trial court also found that Appellant failed to present any evidence to show prejudice or that the outcome of the trial would have been different had this testimony been omitted.

The trial court's rulings were supported by the record and trial counsel's rationale for allowing the evidence to be admitted. Trial counsel testified that she made this decision as part of her trial strategy, and "in order to show deficient performance of trial counsel in regard to trial strategy, an appellant must demonstrate that

counsel's decision was so patently unreasonable that no competent attorney would have made it under the circumstances at the time." *Clark v. State*, 300 Ga. 899, 903 (1) (b) (799 SE2d 200) (2017). We conclude that Appellant failed to meet the burden of showing that her trial counsel was constitutionally deficient because the record shows that her trial counsel's decision not to move to exclude the statements about the polygraph test was a reasonable strategy. See *Strickland*, 466 U.S. at 694. See also *Clark*, 300 Ga. at 903 ("The fact that [Appellant] and [her] present counsel may now find fault with the strategy and tactics employed at trial does not support a finding that trial counsel failed to provide effective assistance to [Appellant]."). Therefore, this enumeration of error fails.

*Judgment affirmed. All the Justices concur.*

Decided June 21, 2021.

Murder. Newton Superior Court. Before Judge Benton.

*Jennifer F. Arndt*, for appellant.

*Randal M. McGinley, Acting District Attorney, W. Cliff Howard, Assistant District Attorney; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Alex M. Bernick, Assistant Attorney General*, for appellee.